## ANDERSON-TULLY CO. et al. v. WINEMAN et al.[*]

(Circuit Court of Appeals, Eighth Circuit.   March 21, 1921.)

No. 5538.

1. **Navigable waters ⬅═45—Movement of river, which washed away island, held not avulsion.**

   A movement of the channel of a river during the course of nine years, whether resulting from a shift in the channel higher up, or from some other cause, which caved off and washed away the upper ends of two islands theretofore existing, was not an avulsion.

2. **Navigable waters ⬅═44 (1)—Evidence held not to show land was accretion of island within state, under which plaintiff claimed.**

   In an action to quiet title to land lying on the east side of the main channel of the Mississippi river, but on the site of former islands which had admittedly been in Arkansas, evidence *held* not to sustain the contention of plaintiff, who purchased it at an Arkansas tax sale, that the land in controversy was an accretion of land originally on the Arkansas side of the main channel, or was a part of an island which itself was an accretion to one of the original islands, and therefore not to show it was in Arkansas.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Action to quiet title by L. W. Wineman and others, composing the firm of A. G. Wineman & Sons, against the Anderson-Tully Company, a corporation, and others.   Decree for plaintiffs, and defendants appeal. Reversed, with directions to dismiss the action for want of jurisdiction.

Allen Hughes, of Memphis, Tenn. (Frank Montgomery, of Tunica, Miss., and W. W. Hughes, of Memphis, Tenn., on the brief), for appellants.

J. B. Daggett, of Marianna, Ark., and H. C. Watson, of Greenville, Miss., for appellees.

Before HOOK and STONE, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.   This is an action to quiet title to real estate.   The occasion of the lawsuit was the shifting of the channel of the Mississippi river in the vicinity of the land in controversy.   The parties agree that the fundamental question in the case is whether the land in controversy lies in the state of Mississippi or in the state of Arkansas.

Appellees are owners of two islands, known as Ship Islands, which, when surveyed by the government in 1823, were on the Arkansas side of the river.   Appellant Ball is the owner of certain lands which, when surveyed by the government in 1835, were adjacent to the river in the state of Mississippi opposite said islands.   The appellant Anderson-Tully Company is the owner of the timber on the lands of the appellant Ball.   The appellant Jones was an employee of the Anderson-

---

⬅═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

272 F.—6          [*]Rehearing denied June 13, 1921.

Tully Company, engaged in removing the timber on said lands at the time the suit was commenced.

At the present time the middle of the area originally occupied by the islands is in the river; the area originally occupied by the islands, which is east of the river, is within the boundaries of the land in controversy; and the area originally occupied by the islands which is west of the river is attached to the Arkansas mainland.

The subject-matter of the lawsuit is, as intimated, a piece of land on the east side of the Mississippi river, apparently in the state of Mississippi. It is at the apex of a great bend in the river, which incloses on the Arkansas side several thousand acres of land. Its western boundary is the present channel of the Mississippi river; on the north, east, and south it is bounded by what is called Old river—an old channel a few hundred feet in width along its middle course and narrowing toward the ends. In shape the land in controversy approximates a segment of a circle of which Old river is the arc and the east bank of the Mississippi river the chord. The land is 3½ miles long and more than a mile wide in its greatest width, and contains about 2,000 acres.

Appellees claim to be the owners of all of said land. Appellants assert title to only that part which may be roughly described as the north half of it. Appellees (plaintiffs there) prevailed in the court below. The defendants (appellants here) have appealed, and assign as ground for reversal of the judgment, in effect, the insufficiency of the evidence to support the finding of the trial court that said land is in the state of Arkansas.

The parties are in disagreement as to the facts under the evidence, but are in substantial agreement as to the law applicable to the case. In support of the judgment of the trial court appellees contend the evidence shows that in the shifting of the river toward the west a part of Ship Islands, or a new island built up on a part of the site of the original islands, passed from the west or Arkansas side to the east or Mississippi side of the main channel of the river, and now forms a part of the land claimed by them—the remainder being, as they contend, accretions to the new-made island, or to the part of Ship Islands around which the channel has shifted.

Appellants contend the evidence shows that in the progress of the river toward the west it washed away all of Ship Islands within the area now in and east of the river, and that the only part of said islands which is now in existence is west of the river in the state of Arkansas. They contend there is no evidence showing that a new island was built up on any part of the site of the original islands, which in the shifting of the river passed from the Arkansas side to the Mississippi side of the main navigable channel of the river, and now forms a part of the land claimed by appellees. Their contention is that the evidence shows that the north half of said land —the part claimed by them—is an accretion to what is known as Fox Island, which is admitted by appellees to be in the state of Mississippi.

During the course of the trial the appellees admitted that the change in the course of the river at this point was not caused by an avulsion, and both parties admitted that at all times some part of Ship Islands was in existence. It is the contention of appellees that the shifting of the main navigable channel of the river, as claimed by them, from the east to the west side of a part of the original Ship Islands, or from the east to the west side of a new island built up on a part of the site of the original islands, was not an avulsion, but was slow and gradual —bringing the case within the rule stated in Commissioners of the Land Office of the State of Oklahoma et al. v. United States et al., 270 Fed. 110, opinion filed December 14, 1920.

It is also the contention of appellees that they are the owners of any new island built up on the Arkansas side of the main navigable channel of the river on the site of the original islands, by virtue of the statute of the state of Arkansas (section 4918, Kirby's Digest), which provides:

"All lands which have formed or may hereafter form, in the navigable waters of this state and within the original boundaries of a former owner of land upon such stream, shall belong to and the title thereto shall vest in such former owner, his heirs or assigns, or in whoever may have lawfully succeeded to the right of such former owner therein."

In respect to the admission that some part of Ship Islands has always been in existence, appellants explain that said admission refers to, and was intended to refer to, a part of said islands west of the river in the state of Arkansas, which, they assert, is still in existence. The admission of appellees that the change in the river was not caused by an avulsion, and the explanation of appellants that at all times some part of Ship Islands has been in existence, are consistent with the contentions made by them, respectively, in this court and in the court below. We dismiss without further comment the meaning and effect attributed to these admissions in the argument of counsel.

The evidence in the case consists of: (a) Opinions of expert witnesses. (b) Maps of surveys of the river and of lands on both sides of the river in the vicinity of the land in controversy. (c) Testimony of living witnesses.

First. Opinions of expert witnesses:

Plaintiffs called C. H. Purvis, an engineer of 30 years' experience. It is his opinion that, when the channel of the river shifted at Bordeaux Chute (this chute is referred to in the case of Davis v. Anderson-Tully Co., 252 Fed. 681, 164 C. C. A. 521, and is a few miles above the land in controversy), a terrific current set in and the caving was very heavy, that a new island was formed on practically the same ground originally occupied by Ship Islands, and that the land in controversy is an accretion to that island.

The defendants called Colonel Ockerson, a civil engineer who had been connected with the government surveys of the Mississippi river since 1876. In his opinion the river has gradually worked its way westward, cut into the soil on the Arkansas side, and deposited soil on the Mississippi side. During the period he has been connected with government surveys of the river he does not think there had

been any such changes in the river in this vicinity as to leave intact on the Mississippi side land that had formerly been on the Arkansas side of the river.

A. M. Alexander, who has been engaged in engineering work for about 10 years and has some acquaintance with the land in controversy, is of opinion that the river has moved gradually, without abrupt change.

A. L. Dabney, a civil engineer of considerable and varied experience, is of the opinion that the river has gradually moved westward in the locality of the land in controversy—an accretion forming on the east side, and caving occurring on the west side.

Second. Maps:

Plaintiffs introduced in evidence composite maps showing the government surveys of 1823 and 1835, the Mississippi River Commission's survey of 1883, and a private survey made for plaintiffs of the land in controversy and of the river and lands in the vicinity of the said land in controversy in 1916.

Defendants introduced in evidence composite maps showing the government surveys of 1823 and 1835, the Mississippi River Commission's survey of 1883, and a private survey made for defendants of the land in controversy and of the river and lands in the vicinity of the said land in controversy in 1916.

The maps of the parties showing the surveys above mentioned are in every respect similar. The maps of the defendants also show a survey of 1878 by the Mississippi River Commission. They also introduced in evidence official maps prepared by the Mississippi River Commission of the surveys of the river made under the direction of the Commission in 1878, 1881, and 1883. In addition to these official maps, defendants introduced in evidence an official map of a survey of the river made by Colonel Suter under the direction of the War Department in the vicinity of the land in controversy, in 1874.

Counsel for appellees vigorously attack the accuracy of the Suter survey and question the accuracy of the Commission survey of 1878. Inasmuch as the accuracy of the Commission survey of 1883 is admitted, it becomes unnecessary to determine the accuracy of the questioned surveys in respect to details. In broad outline the surveys of 1874 and 1878 are corroborated by the survey of 1883 and by the testimony of living witnesses called by the plaintiffs. The surveys and maps will be referred to and considered in connection with the testimony of the witnesses called by the parties.

Third. The testimony of living witnesses:

J. D. Palmer, a witness called by the plaintiffs, has been acquainted with the river in the vicinity of the land in controversy, from childhood. He was born in 1856, and his recollection of the river and its surroundings would probably not be much earlier than 1865. He testified that he had been acquainted with what is generally known as Ship Island for about 50 years. The case was tried in 1919, and 50 years earlier was 1869. He says:

"When I first remember the island, it was used as a plantation and woodyard by John McCann. He had about 100 acres in cultivation. The place was in Arkansas."

On cross-examination he said:

"When I first knew these islands, there were two channels, one east of Ship Island, and the other west of Ship Island. The eastern channel ran between the Arkansas shore and Fox Island, and between the north end of Ship Island and the south end of Fox Island. The river between these two islands must have been over a half to a mile wide. The channel between Ship Island in Arkansas there was navigable, and was narrower, and was called the Chute."

George Garrison, a witness called by plaintiffs, an old colored man 87 years old, born in 1832, speaking of Ship Island, says:

"I have known it since 1840. It was all wild woods then. It was on the west side of the river, and nothing between it and Austin, except water. * * * John McCann had a woodyard on the east side of Ship Island next to Austin. * * * When I first knew the territory, boats from Memphis got to Austin by going between Ship Island and what is now known as Fox Island."

W. J. Nelson, 67 years old, born in 1852, a witness called by plaintiffs, testified:

"I have known the land generally known as Ship Island since 1858. It was then said to be in Arkansas. * * * When I first remember, the Mississippi river lay between Fox Island and Ship Island. * * * The McCann farm and woodyard was directly west of Austin."

As already stated, the land in controversy is at the apex of a great bend in the river, which incloses, on the Arkansas side, several thousand acres of land. At the time of the government survey in 1823, the land inclosed in the bend was approximately in the shape of a parallelogram about 5 miles long and 2½ miles wide. The lower end of this land has long been known as Hardin's Point. Under Hardin's Point were two islands, since known as East and West Ship Islands. West Ship Island was a long, narrow island, separated from the mainland by a narrow chute, not more than 200 yards wide, and contained about 500 acres. East Ship Island lay east of West Ship Island, and contained about 800 acres. Between the islands there was a chute, about 600 yards wide at its upper end, and about one-half that wide at its lower end. The islands in their greatest length were more than 2 miles long. East Ship Island was the eastern extremity of the land inclosed in the great bend of the river, around which the river swept in its course from east to west. The witnesses have East Ship Island in mind when they speak of Ship Island in their testimony. The town of Austin is in the state of Mississippi, located about one-half mile east of the river bank of 1835, and southeast from East Ship Island. Looking west from Austin, the line of vision is one-fourth of a mile south of the most southerly point of East Ship Island as it existed in 1823.

Fox Island is the name of a long, narrow piece of land, presumably an accretion, on the Mississippi side of the river northeast of Ship Island. It is evident from the testimony of the witnesses above

quoted that East Ship Island, or some very considerable part of it, was still in existence within the memory of these witnesses. It is undoubtedly true that John McCann had a farm and woodyard upon East Ship Island. One of the allegations of plaintiffs' complaint is that John McCann, by deed dated in 1852, from Benjamin Springer and wife, became the owner of all fractional sections 27, 32, 33, and 34. All these lands were on East Ship Island, except a few acres of section 32 which was on West Ship Island.

The witness Palmer, testifying further, said:

"When I first remember Ship Island it was about 7 or 8 miles long and a mile and a half or 2 miles wide. The lower end of it at that time was about opposite Harbert's Landing on the Mississippi side, and the upper side was about opposite Hunt's Landing on the Mississippi side."

Harbert's Landing was around the bend about 5 miles west of Austin. Hunt's Landing was on the river bank at the foot of Selden avenue, a roadway running east and west, located more than a mile north of Austin. It appears from the testimony of the witness Palmer, last quoted, that in the interval since 1835, by accretions to East Ship Island, or by the formation of a new island or islands south and west of East Ship Island, and by filling in or accretions to the islands, new or old, or both, all became united into one island, extending East Ship Island southwest and west a distance of 4 or 5 miles, in the form of an arc of a circle around the bend. This island we will hereafter refer to as Long Ship Island.

There is no evidence in the record from which it is possible to determine where, when, or how Long Ship Island began to be formed, or when it reached its maximum size. It is a matter of conjecture whether a sand bar or island formed somewhere southwest or west of East Ship Island and thereafter built up to and united with it, or whether by accretions to East Ship Island that island was extended 4 or 5 miles in length, as described by the witness Palmer. If it is assumed a sand bar or island formed somewhere southwest or west of East Ship Island, which afterwards built up to and united with it, then it is a matter of conjecture whether such sand bar or island when first formed was on the Arkansas side or Mississippi side of the main navigable channel of the river.

The testimony of the witnesses is convincing that, at some time during or after the formation of Long Ship Island, the chute between East and West Ship Islands became the main navigable channel of the river. In addition to the testimony of the witness Palmer already quoted on this subject, he testified:

"When I first knew this island, there was a channel on each side of it. The old river came around by Austin, and what is known as the Chute went west of the island. * * * I don't know which end of the old channel around in front of Austin closed up first, but I think the upper end did. It just gradually filled. * * * For a long time they could go down to the lower end of Ship Island; and go on up the old channel nearly to Austin."

Henry Clark, 60 years old (born 1859), a witness called by plaintiffs, who had known the land commonly called Ship Island since 1869, testified:

"The main channel was then (1869) west of the island."

The witness Nelson, apparently, though probably not altogether, testifying to his earliest recollection, said:

"But there were two channels; the main channel on the Arkansas side and the old river on the Mississippi side. We have always called the channel on the Mississippi side the Old Chute. In high water boats could run on both sides, but in low water they ran on the Arkansas side."

It is quite apparent from his testimony that the witness Palmer was familiar with the existence of East Ship Island, as distinguished from the long island of his earliest recollection. He says:

"The island caved off at the upper end. Considerable of the original Ship Island caved off. * * * I do not think there is any of the old original Ship Island there. I couldn't say for certain. * * * All the upper part of the island down to opposite Austin caved off before I left" (in 1882).

The witness Nelson, testifying as to the caving of the island, said:

"The main cave was on the north of Ship Island—north and west. When I first knew the island, the end was 200 or 300 yards northwest of Austin."

It is reasonably certain that between 1865, or about that date, and 1882, the upper end of East Ship Island, if not substantially all of the island, caved off and washed away; and, as we shall hereafter see, the same thing must be true of West Ship Island. The witness Palmer, testifying further as to the caving and washing away of Long Ship Island, said:

"At the lower end of Ship Island, it caved the island off for a mile as far as to about O. K. Landing [about two miles southwest of Austin on the Mississippi side of the river]. * * * The caving I mentioned on the lower end of Ship Island, opposite O. K. Landing, was from the Chute river east. Near what is known as Shoo Fly bar [down the river in the neighborhood of Harbert's Landing] the old river caved off annually. * * * I don't know exactly the year that McCann quit the wood business over there. It was long about '68, '69, or '70. He was an old man, and the river was caving, so he moved to Austin, and lived there a number of years. It was caving eastward. * * * When I moved away from Austin, there was a very narrow strip of that original island there. * * * There was a strip of the old island left, running up next to the old channel, that constituted the main river originally. When I left there was a little strip of old timber there of the original island right west of Austin."

The witness Garrison testified:

"John McCann had a woodyard on the east side of Ship Island next to Austin. His place washed away in 1870."

The witness Nelson testified that he kept the landing at Shoo Fly—located about half way between O. K. and Harbert's Landing—until 1887. He said:

"Some of Ship Island was still intact. Lots of it had gone away. * * * In 1872 I got on a boat on the west side of the island. Practically all of it was then intact. * * * The main cave was on the north of Ship Island—north and west."

The witness Clark testified:

"The main channel was then west of the island, and there was a chute called 'Austin Chute' on the east side. That chute was about 200 yards wide and navigable up as far as Austin. * * * Ever since I can remember, the

foot of Ship Island was opposite O. K. Landing, and it was about the same shape it is now."

Putting the testimony of these witnesses together into a connected story, it is fairly conclusive that prior to 1874 all of East Ship Island had been washed away, except a narrow strip of timber west of Austin; that the new-made land of Long Ship Island had been washed away between Harbert's Landing and O. K. Landing; that of Long Ship Island there was left only a remnant, a small island near the Mississippi shore, extending southwesterly from Austin to O. K. Landing—a distance of a mile and a half or 2 miles. On the westerly edge of this new island there was a narrow strip of old timber of East Ship Island remaining, according to the witness Palmer, as late as 1882. As we shall see, he was probably mistaken as to the date. New Ship Island, as long as it contained any part of East Ship Island along its western edge, was not less than a mile in width.

If we compare the Suter map of 1874 with the conditions above described, we find that according to the map the original Ship Islands and Long Ship Island have disappeared; that southwest of Austin, between it and O. K. Landing, just off the Mississippi shore, there is a small island marked "Ship Island No. 57," in every respect similar to the new island described by the witnesses. Between the island and the Mississippi shore there appears a narrow channel or chute 200 or 300 yards wide. Extensive sand bars are shown on both sides of the river, and Fox Island appears as a long, narrow piece of land about 2 miles northwest of Austin.

From the foregoing description it is apparent that the Suter map in general outline is in every respect in harmony with the testimony of the witnesses. Upon comparison we also find the Mississippi River Commission map of 1878 in general outline to be in harmony with both the Suter map and the testimony of the witnesses. According to the map of 1878, East Ship Island and Long Ship Island have disappeared. New Ship Island, apparently slightly larger in size than is shown on the Suter map, occupies the position given it by the witnesses and by the Suter map. According to the map of 1878 the sand bars on the Suter map have been in large part washed away. Two sand bars are shown upon the map of 1878 in the middle of the river, in part upon the site of the northerly ends of East and West Ship Islands.

The map of the surveys of the Mississippi River Commission of 1883, admitted by plaintiffs to be accurate, shows New Ship Island in the same position given it on the other maps and by the witnesses, except that it is eroded along its outer or western edge and is smaller than it was on the map of 1878. New Ship Island, as shown on the maps of 1878 and 1883, is upon no part of the site of East Ship Island. The narrow strip of old timber along the western edge of New Ship Island, mentioned by the witnesses, was undoubtedly of an earlier date, and had, prior to 1878, been washed away.

The Arkansas shore line of the river of 1883 was a mile southwest of the Arkansas shore line of 1823 for a distance of about 4 miles, extending southeasterly from a point south of and opposite

the outlet of Bordeaux chute to the east side of East Ship Island. For that entire distance the Mississippi shore line was also below and southwest of the Arkansas shore line of 1823. In other words, in 1883 the river had shifted to the southwest, so that the river, for a distance of about 4 miles below Bordeaux chute, was wholly within what had in 1823 been the Arkansas mainland and East and West Ship Islands.

The Arkansas shore line of 1878, as shown by the survey of that date, differed but slightly from the Arkansas shore line of 1883. The Mississippi shore line of 1878 differed materially from the Mississippi shore line of 1883, by reason of sand bars and accretions built up on the Mississippi side of the river between said dates.

If a comparison is made with the Suter map, and attention given to the appearance of the river in general outline, the position of the shore lines, and their relation to each other, one cannot escape the conclusion that in 1874 the river had already shifted approximately to the position it occupied in 1883. The shifting of the river shown by the various maps certainly occurred, in large part, during the time Long Ship Island was being washed away.

[1] Aside from the admission to that effect, it is certain that the movement of the river now being considered was not an avulsion. Whether as the result of the shifting of the channel of the river at Bordeaux chute, or from some other cause, the river, between 1865 and 1874, began to erode the northerly side of the mainland below Bordeaux chute, and to cave off and wash away the upper ends of East and West Ship Islands. During the same period the lower part of what we have called Long Ship Island was also washed away.

It is reasonable to conclude, from the testimony of the witnesses describing the caving off and washing away of the upper end of East Ship Island, when considered in connection with the position of the channel of the river as shown by the maps of the surveys of 1874, 1878, and 1883, that the parts of East and West Ship Islands within the area northeast of the main navigable channel of the river in 1883, had been washed away by a gradual movement of the channel westward. This conclusion is confirmed by the conduct of the then owners of the islands.

[2] Plaintiffs' title is based upon tax titles acquired by the state of Arkansas through sales of said lands for taxes. According to the allegations of plaintiffs' complaint all of said lands, except two quarter sections, were forfeited and sold to the state of Arkansas for the nonpayment of taxes for the years 1865 to 1875.

One of the excepted quarter sections was forfeited and sold for the taxes of 1886; the other, owned by John McCann, was forfeited and sold for the taxes of 1876. The failure of the several individual owners to pay the taxes, and to prevent forfeiture and sale of the lands for taxes accruing for the years 1865 to 1875, is most significant, and the fact that John McCann continued to pay taxes upon one fractional quarter section of his land until 1876 is equally significant. This quarter section was on the south side of East Ship Island—the side of said island west of Austin. The strip of timber observed by the wit-

nesses west of Austin was, no doubt, on this quarter section; and was the last of the McCann land to be washed away by the river and to disappear. It is fair to say that John McCann continued to pay taxes as long as he had any land in existence.

In addition to the testimony of the witnesses detailing their observations of the caving and washing away of East Ship Island, the representation of the maps showing its disappearance, and the silent action of the then owners in simultaneously ceasing to pay taxes on hundreds of acres of the islands, there is the testimony of the witnesses Alexander and Dabney to the effect that they examined the land in controversy, including the parts of it on the site of East and West Ship Islands, and found no timber growing thereon comparable to the timber found on the mainland in the neighborhood.

As already noted, the Mississippi shore line of 1883 was markedly different from the Mississippi shore line of 1878. On the Mississippi River Commission map of 1878 there is shown a sand bar in part upon the site of the upper ends of East and West Ship Islands, lying between two channels of the river. From the point of separation of the two channels one passes north of the sand bar toward the east under the lower end of Fox Island and along the east bank of the river to Austin Landing, thence southwest, parallel to the west bank of New Ship Island, to a point west of the island and north of O. K. Landing, where it unites with the other channel, which comes down the river west of the sand bar.

The map of 1883 shows that between that date and 1878 the river had abandoned the channel under Fox Island and down the Mississippi bank to Austin Landing. In the interval between these two dates a sand bar southwest of and adjacent to Fox Island had been built up about a mile wide. United to and southeast of this sand bar there is shown upon the map a body of land marked "Willows" and "Sand" extending south and southeast below the sand bar and Fox Island for a distance of more than 2 miles, terminating in a point below the south line of the lands claimed by the defendants. East of this new-made land, and between it and the river bank of 1878, is a chute, about 200 yards in width, extending up to and terminating immediately below Fox Island. This chute is a part of what is now called Old river. The most southerly point of this new-made land was a half mile north of the north end of New Ship Island. Included within the limits of this new-made land is that part of the sand bar or island of 1878, which was upon the site of the upper ends of East and West Ship Islands. This land, with the subsequent accretions to it, constitutes, roughly speaking, the north half of the lands claimed by plaintiffs—the south half being New Ship Island, with its accretions on the north and west.

Plaintiffs contend: That this sand bar or low-lying island of 1878, was, when formed, west of the main navigable channel of the river, and therefore in the state of Arkansas; that by accretions to the sand bar or island as a nucleus the new-made land above described was built up; that title to said sand bar or island and its accretions is vested in them by the statute of the state of Arkansas above quoted and the common law of accretions. Is there any ground for the con-

tention that this sand bar or island was, when formed, west of the main navigable channel of the river?

As already stated, it is reasonable to conclude from the testimony of the witnesses describing the caving off and washing away of the upper end of East Ship Island, when considered in connection with the position of the channel of the river as shown by the maps of the surveys of 1874, 1878, and 1883, that the parts of East and West Ship Islands within the area northeast of the main navigable channel of the river in 1883 had been washed away by a gradual movement of the channel westward. This sand bar or island is not, then, any part of the original islands, around which the channel of the river shifted in its movement toward the west. There is nothing in the evidence which suggests that there was any reverse movement in the channel, after the river had begun to erode and wash away the upper ends of Ship Islands, which would have allowed space and time for the building up of a sand bar or island west of the main channel of the river.

A study of the Suter map leads to an opposite conclusion. The river is comparatively narrow in the vicinity where East and West Ship Islands must have been located. It is probable that the upper ends of the islands were in or near the sand bar west and south of Fox Island. When we study the map of the survey of 1878 in connection with the Suter map, it is a reasonable conclusion that the river after 1874 cut a channel through and around the sand bar west and south of Fox Island and washed the sand bar away, except that part of it shown in the middle of the river on the map of 1878. This inference is reinforced when we observe the name Fox Island Landing marked upon the west side of the sand bar on the map of 1878. This notation indicates that this point had been at some previous time attached to Fox Island and used as a landing by the people on the east or Mississippi side of the river.

The conclusion from the maps is that the sand bar or island in the middle of the river in 1878 was formed on the east side of the main channel of the river by accretion to Fox Island during the time Ship Islands were being eroded and washed away.

Plaintiffs also make the contention that they are vested with the title to New Ship Island and its accretions, because it was at one time a part of Long Ship Island, which, in turn, as they claim, was East Ship Island and accretions to it. We have already stated wherein the evidence is insufficient to support this contention.

Upon any view of the case, we think that plaintiffs have failed to show that any part of the land claimed by them lies within the state of Arkansas. The trial court, therefore, was without jurisdiction.

The decree is reversed, and the court below is directed to dismiss the action for want of jurisdiction.