**KIMBLE v. WILLEY.**

Civ. No. 353.

United States District Court
E. D. Arkansas, E. D.

June 22, 1951.

·Cracraft & Cracraft (George K. Cra-
craft), Helena, Ark., Bailey & Warren
(Bruce T. Bullion), Little Rock, Ark.,
for plaintiff.

Moncrief & Moncrief (John W. Mon-
crief), Stuttgart, Ark., for defendant.

LEMLEY, District Judge.

This cause having been submitted to the
Court upon the pleadings filed herein, the
stipulations of the parties, the depositions

of witnesses and exhibits thereto, and written briefs; and the Court being well and fully advised, doth make the following Findings of Fact, Conclusions of Law, and Comment thereon:

## I. Findings of Fact

### 1.

Plaintiff is a citizen of Mississippi; defendant is a citizen of Tennessee; the amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000. The action is local in nature and is brought to quiet title to certain lands located in Desha County, Arkansas in the Eastern Division of this District. In addition to the land embraced within the "area in controversy", there is involved in this lawsuit the sum of $5,048.37 representing the value of certain timber which has been cut and removed from the area in controversy, which sum is now on deposit in the registry of this Court.

### 2.

Certain facts have been stipulated by the parties and the Court finds such facts to be as stipulated.

### 3.

The area in controversy consists of 380.5 acres of land known as Cook's Point, which is presently located on the left descending bank of the Arkansas River in the vicinity of Arkansas Post, and which lies within the prongs of a crescent shaped lake known as "Moody's Old River". Said area in controversy is described by metes and bounds in the plaintiff's complaint and in his muniments of title. Prior to 1926, Cook's Point was located on the right descending bank of the Arkansas River and was firmly attached to the right riparian shore of said river; in the fall of 1926, an avulsion occurred, as a result of which the river abandoned its old channel running around Cook's Point and cut across the narrow neck of the Point, adopting this neck as its new channel. The effect of this avulsion was to place Cook's Point on the left descending side of the river and to leave the old channel as an "ox-bow lake", which, as stated, has become known as "Moody's Old River".

### 4.

At the time of the original government survey of Section 8, Township 8 South, Range 3 West (South of the Arkansas River), in 1839, the East half of the Northeast Quarter and the Southeast Quarter of Section 8, Township 8 South, Range 3 West, SAR, were riparian to the right descending bank of the Arkansas River, said Section 8 being at that time in Arkansas County; in 1871, by statute, this land was transferred to Lincoln County, and thereafter in 1879 to Desha County where it has remained to this date.

### 5.

The left descending bank of the Arkansas River in the vicinity of Arkansas Post and of the area in controversy was originally surveyed in 1819; laid off in this survey was a fractional section of land designated as Section 1, Township 8 South, Range 4 West, which was North of the Arkansas River and the west half of which was riparian to the Arkansas River. This fractional section of land was approximately across the river from Section 8 referred to in Finding No. 4, supra.

### 6.

Plaintiff deraigns title to the area in controversy from the late Governor Frank O. Lowden of Illinois who, prior to 1926, held record title to the following portions of Section 8, Township 8 South, Range 3 West: the Southeast Quarter, the East half of the Northeast Quarter, and the South half of the Southwest Quarter. Taxes on these lands had been paid for many years by Governor Lowden prior to 1926 in Desha County, and were paid by him in said County subsequent to 1926 and up to 1944, and by the plaintiff from 1944 to 1948 inclusive.

### 7.

Defendant deraigns title to the area in controversy through certain tax deeds describing Frl. Section 1, Township 8 South, Range 4 West; these deeds were based upon tax sales conducted by the taxing authorities of Arkansas County. He further deraigns title by virtue of a deed

from one T. P. Bass, as guardian of T. P. Bass, Jr., dated October 20, 1930, which described Frl. Section 1, Township 8 South, Range 4 West. He further claims title by virtue of actual adverse possession for the statutory periods of time. Defendant also relies upon various decrees of the Chancery Court of Arkansas County in various proceedings, which decrees, he contends, are res judicata of all issues in this case and serve to vest title to the area in controversy in him as against all claims of the plaintiff. We do not reach the question of the effect of these decrees upon the issues in this case.

The defendant, W. H. Willey, is the successor in title to his deceased brother, Charles F. Willey, who acquired tax titles to Frl. Section 1 and who also acquired the above mentioned deed from T. P. Bass. Defendant and his predecessor have paid taxes in Arkansas County on Frl. Section 1, Township 8 South, Range 4 West for more than 20 years.

8.

Plaintiff contends that the area in controversy was formed as accretions to the parts of Section 8 on the right descending bank of the river, owned by Governor Lowden, between the years 1839 and 1926, and that it consists of these accretions together with such portions of original Section 8, if any, as survived the avulsion of 1926, the effect of which was to sever the area from the right descending bank of the river and place it upon the left descending bank. Defendant, on the other hand, contends that the area in controversy did not form as accretions to Section 8 but formed as an independent island formation in the river, and that accretions formed on this island and extended eastward into all or part of the geographical area formerly occupied by Frl. Section 1 which had been subjected to continuous erosion for many years.

9.

We find from a preponderance of the evidence that the area in controversy represents true accretions to Section 8, Township 8 South, Range 3 West, SAR, together with such portions, if any, of original Section 8 as survived the 1926 avulsion; the area in controversy is located in Desha County, said avulsion having effected no change in county boundary lines. This area was formed by the actions of the Arkansas River in changing its channel between the years 1839 and 1926; as the area in controversy was formed by accretion to the right descending bank, corresponding erosion occurred on the left descending bank and Frl. Section 1, Township 8 South, Range 4 West, as originally surveyed, was completely eroded away, and completely lost its identity. Since sometime prior to 1917 and at the time the present suit was filed no such legal description as Frl. Section 1, Township 8 South, Range 4 West, NAR, has been in existence, and such a description has not since before 1917 described or identified any land in place. That description had been destroyed by the River's erosion, and since before 1917 it ceased to identify any land in place. The area in controversy did not originate as an island.

10.

The area in controversy occupies a large portion of the geographical area formerly occupied by Frl. Section 1, and likewise occupies a portion of certain Spanish Grants which were originally surveyed on the left descending bank of the river. There is land in existence to the North of Moody's Old River, which is not in controversy here, which occupies the geographical area originally occupied by a portion of Section 1, but this land is not original land; it is land which has re-appeared as a result of channel changes of the river between 1884 and 1917. As heretofore stated, at one time or another between 1839 and 1917 all of Frl. Section 1 was washed away and completely destroyed.

11.

As the area in controversy is located in Desha County, the tax forfeiture proceedings in Arkansas County upon which the defendant relies were void for want of power to sell, nor have the tax payments made by the defendant and his predecessor

in Arkansas County upon Frl. Section 1 been efficacious to divest record title to the area out of the plaintiff. Record title to the area in controversy is in the plaintiff, and if the defendant is to prevail, he must do so on the strength of adverse possession for the statutory period.

12.

In June of 1926 the tax collector of Arkansas County undertook to sell for delinquent taxes for 1925 the Frl. NW¼ of Section 1, Township 8 South, Range 4 West, and likewise All of Frl. Section 1, Township 8 South, Range 4 West, except the Frl. NW¼ thereof, which two descriptions purported to embrace all of Frl. Section 1; that at this sale said lands were purchased by T. P. Bass, Jr., a minor; that on June 18, 1928, said lands remaining unredeemed on the tax books of Arkansas County, the Clerk issued two tax deeds to T. P. Bass, Jr., conveying said lands to him. That these deeds were duly filed for record and recorded in Arkansas County.

13.

That sometime prior to October 20, 1930 (the Court is unable to ascertain the exact date from the evidence) T. P. Bass entered into the actual possession of the area in controversy under and by virtue of the two tax deeds above mentioned and on behalf of his said minor son, T. P. Bass, Jr., and by constructing a fence and utilizing natural barriers completely enclosed the same and began to utilize it for the grazing of cattle; that this possession commenced sometime prior to October 20, 1930, and continued until that date, and that it was actual, open, notorious, hostile, peaceable, adverse, and with the intent to acquire title thereto in opposition to the real owner thereof.

That when T. P. Bass first went into possession of the area in controversy he constructed a fence running from the north prong of Moody's Old River to the south prong thereof, which fence at that time was sufficient to hold his cattle within in the area of Cook's Point which is the area in controversy. That thereafter the main channel of the Arkansas River migrated westward away from Moody's Old River and that it became necessary for Bass to contruct another fence in order to hold his cattle within an enclosure. That the second fence ran from the south prong of Moody's Old River to the then channel of the Arkansas River, part of it across an open sandbar adjacent to the river; that this second fence, together with other fences in existence served to continue to enclose the entire area in controversy along with certain other land owned or claimed by Bass. That the maps and charts introduced in evidence indicate that these fences were plainly visible from across the River where other lands owned by Governor. Lowden were located, and that said fences could not have escaped being seen had Governor Lowden's agents or overseers ever crossed the river and gone upon the area in controversy. That the existence of these fences and the grazing of cattle were sufficient to charge Governor Lowden with notice that the area in controversy was enclosed and occupied.

14.

Prior to October 20, 1930, T. P. Bass had obtained an order from the Probate Court of Arkansas County authorizing him, as guardian of his son, T. P. Bass, Jr., to sell Frl. Section 1, Township 8 South, Range 4 West at public sale; Such sale was held and the area was purchased by Charles F. Willey; the sale was approved and confirmed, and on October 20, 1930, a guardian's deed was issued by Bass to Willey under the terms of which Bass quit-claimed to Willey all of Frl. Section 1, Township 8 South, Range 4 West. That in executing this deed, it was Bass' intention to sell to Willey and Willey's intention to buy from Bass the area in controversy. That on the same day, Charles F. Willey leased to Bass for grazing purposes for a term of one year and for a consideration of One Dollar all of Frl. Section 1, Township 8 South, Range 4 West, and that Bass continued his possession of the area in controversy as the tenant of Willey. That said lease provided among other things that the lessor should have the bene-

fit of the fence belonging to the lessee which then stood "as an enclosure to this land as well as other lands claimed by the party of the second part (lessee)." Bass was obligated to keep this fence in repair and to keep out trespassers and was forbidden to cut timber or to sublease any part of the land. The lease further provided that it should terminate at the expiration of one year from October 29, 1930, and that "any possession held thereafter on the part of the party of the second part shall not serve to renew the lease but that the possession shall be that of the party of the first part (lessor.)". This lease was recorded among the land records of Arkansas County, Arkansas on October 23, 1930. It was Willey's intention to lease to Bass the area in controversy, and it was Bass' intention to lease from Willey the area in controversy. There was no change in the nature or extent of Bass' possession after the execution of this deed and lease, except that prior to their execution he was holding for the benefit of his son, whereas after their execution he was holding as the tenant of Charles F. Willey.

### 15.

On June 15, 1931 Bass, without yielding possession of the area in controversy and without any notice to Willey, obtained from Governor Lowden for a term of one year and for a consideration of $5.00 a grazing lease on lands lying on the left descending bank of the Arkansas River and including the area in controversy. This lease was not recorded and Willey had no notice of its existence. At the time this lease was executed Bass was upon the land as tenant of Charles F. Willey, and under the laws of Arkansas Lowden was charged with notice of Bass' presence on the land and of the right or title by which he was there. Bass' action in attempting to recognize and hold under the Lowden title without yielding possession to Willey, and without any notoriety, did not prejudice Willey's rights nor did it oust him from possession.

### 16.

The primary term of the Willey-Bass lease expired on October 29, 1931, where-

as the primary term of the Lowden-Bass lease expired on June 15, 1932. After the expiration of these primary terms Bass remained in possession of the area in controversy; neither Lowden nor Willey ever demanded or received any additional rent from Bass after the expiration of the primary terms of said leases.

### 17.

In 1936 Governor Lowden sold the timber on the area in controversy to Chicago Mill and Lumber Co.; as far as the evidence shows, the timber deed or contract in favor of Chicago Mill & Lumber Co. was not recorded. On June 28, 1937, Chicago Mill & Lumber Co. entered into a contract with Press Whiting to cut and remove the timber from this area. The cutting and removing was begun in July of 1937 and was completed by August 18, 1937. There is no evidence that Charles F. Willey had actual notice of the cutting or removing of this timber until sometime in 1947; on the other hand, there is evidence that he was a man of advanced years, was in poor health, and spent much of his time in hospitals throughout the country, and was absent from the State of Arkansas at the time the timber was cut and removed and thereafter.

### 18.

After the completion of the cutting and removing of the timber on August 18, 1937, Bass remained in possession of the area in controversy as the tenant of Charles F. Willey, and said possession continued until the death of Charles F. Willey in the early part of 1948 and thereafter up until this suit was filed. The continued possession of Bass after August 18, 1937, was the possession of Willey, and it was actual, open, notorious, hostile, peaceable, exclusive, and adverse, and at all times between August 18, 1937, and his death Charles F. Willey had the intent to acquire title to the area in controversy adverse to that of the record owner.

### 19.

Charles F. Willey died testate and his will was admitted for probate in Arkansas County on July 15, 1948. Under the terms of said will he devised all of his real es-

tate, including his interest in the area in controversy, to W. H. Willey, defendant herein.

## II. Conclusions of Law

### 1.

The Court has jurisdiction of this cause and of the parties hereto.

### 2.

The plaintiff has discharged his burden of proof that the area in controversy formed as true accretion to Section 8, Township 8 South, Range 3 West, South of Arkansas River, and that said area is in Desha County, Arkansas, and that record title thereto is in the plaintiff.

### 3.

The defendant has established by a preponderance of the evidence that his testator and predecessor, Charles F. Willey, went into the actual, open, notorious, hostile, exclusive, and adverse possession of the area in controversy with intent to acquire title thereto. This possession was taken by T. P. Bass as Charles F. Willey's tenant, and the possession of Bass was the possession of Willey; Bass' attempted attornment to Governor Lowden in 1931 was void and did not prejudice Willey nor turn him out of possession, nor did it change the character of his possession. Bass' occupancy of the area in controversy was notice to Lowden and to all the world of his occupancy and of Willey's title under which he held.

### 4.

Willey's occupancy through Bass of the area in controversy was continuous and exclusive from October 20, 1930 at least up until July of 1937 when the Chicago Mill & Lumber Co., under grant from or contract with Governor Lowden, entered the area in controversy and cut and removed the timber from said area. Assuming without deciding that this cutting and removing of the timber interrupted Willey's possession of the area, it did not validate Bass' attempted attornment to Governor Lowden, did not change Bass' possession from that of Willey to that of Lowden, did not oust Willey from possession, and did not change the nature of Willey's possession. The continued possession of Bass after August 18, 1937, as the tenant of Willey, which possession possessed all of the attributes necessary to make operative the seven year statute of limitations, persisted for more than seven years and vested title to the area in controversy in Charles F. Willey, and defendant has succeeded to his title and is the owner of the land in controversy.

### 5.

The plaintiff's complaint should be dismissed for want of equity, and the funds in the registry of this Court should be paid over to the defendant in accordance with the terms of the decree to be entered herein. The injunction heretofore issued by this Court directed against the defendant should be dissolved. As to costs, equity will be done by requiring each party hereto to bear his own costs.

### 6.

Our decision on the merits renders it unnecessary for us to pass upon the defendant's "Demurrer and Motion to Dismiss" filed herein prior to Answer.

### 7.

The Court does not pass upon the applicability of the Arkansas two year statute of limitations to this case, nor do we pass upon the effect upon the parties hereto of the various decrees of the Chancery Court of Arkansas County, Arkansas, which have been pleaded and to some extent relied upon by the defendant.

### III. Comment.

This action was commenced by the plaintiff on December 30, 1948 [1] when he was notified by Pierce Williams Co., to whom he had sold the timber on the area in con-

---

[1] The case, in which the record is voluminous, was first submitted on depositions and written briefs; later additional depositions were taken and final submission was made on the entire record and additional briefs.

troversy and who was engaged in cutting and removing said timber, that the defendant W. H. Willey, was laying claim to the area and to timber thereon, and that it was unwilling to make payment to the plaintiff until the validity of Willey's claim had been determined. Shortly after receiving notice of Willey's claim, the plaintiff filed this action to quiet his title to the area and to cancel Willey's claim, as to the nature of which he claimed to be ignorant. After the suit was filed, the parties agreed that the proceeds of the plaintiff's sale of the timber should be deposited in the registry of this Court, which was done, and this case involves title to this fund as well as the title to the lands in controversy.

As stated in our foregoing findings of fact, the plaintiff claims ownership of the area in controversy (known as Cook's Point and lying within the confines of an old river lake called "Moody's Old River", an area consisting of 380.5 acres of land and described in the complaint) through conveyances from the estate of the late Governor Frank O. Lowden of Illinois, and contends that the area is located in Desha County, Arkansas. Defendant, on the other hand, claims that the area in controversy is located in Arkansas County, Arkansas, and that he is the owner thereof by virtue of certain tax forfeitures in Arkansas County, and also by virtue of actual adverse possession for more than seven years.

The record presents three problems: 1. The nature and origin of the area in controversy. 2. Adverse possession on the part of the defendant and his brother, Charles F. Willey, his predecessor in title.

3. The effect, if any, on the rights of the parties hereto of various decrees rendered at various times by the Chancery Court of Arkansas County involving land described as Fractional Section 1, Township 8 South, Range 4 West. The conclusions which we have reached with respect to the first two questions render a discussion of the third unnecessary. Furthermore, our determination that the defendant and his predecessor in title, Charles F. Willey, have been in the actual adverse possession of the area in controversy for more than seven years renders it unnecessary for us to discuss the defendant's contention that the so-called "two year" statute of limitations is applicable.[2]

The contentions of the respective parties as to the nature and origin of the area in controversy have been set forth in our findings of fact, reference to which is hereby made; in support of their respective theories plaintiff and defendant rely upon expert witnesses, official maps and charts of the portion of the Arkansas River under consideration, and the testimony of lay witnesses who have been familiar with the area in controversy for considerable periods of time. The plaintiff called as his expert witnesses, Major Austin B. Smith of the United States Army Engineers, who is a recognized expert on the channel changes of the Arkansas River; Mr. R. H. Shackleford, a civil engineer, who is likewise connected with the Army Engineers; and Mr. Thomas Strode, who, at the time he gave his deposition, was serving his third term as County Surveyor of Arkansas County. Defendant called as

2. Defendant pleaded both the "seven year" and the "two year" statutes of limitation. The "seven year" statute, Ark.Stats.1947, 37–101, insofar as pertinent here, is as follows: "No person * * * shall have, sue or maintain any action or suit, either in law or equity, for any lands, * * * but within seven (7) years next after his * * * right(s) to commence, have or maintain such suit shall have come, fallen or accrued; and all suits, either in law or equity, for the recovery of any lands, * * * shall be had and sued within seven (7) years next after title or cause of action accrued, and no time after said seven (7) years shall have passed. * * *" The "two year" statute, Ark. Stats.1947, 34–1419, provides in substance that no action shall be brought to recover any lands from any person who has purchased the same at any collector's sale for delinquent taxes or from the State Land Commissioner after such lands have been certified to him for nonpayment of taxes "unless the plaintiff, his ancestors, predecessors, or grantors, was seized or possessed of the lands in question within two years next before the commencement of such suit or action, * * *".

738

his expert Mr. W. D. Dickinson, a well known civil engineer of Little Rock, Arkansas.

Major Smith, Mr. Shackleford, and Mr. Strode all testified in their opinions that the area in controversy formed as true accretion to Section 8, and that it did not form as an island in the river. They all likewise agreed that the erosion of the river into the descending left bank had completely destroyed Section 1 which was originally laid off on that bank. Mr. Dickinson, on the other hand, was of the opinion that the area had first formed as an island, and that the erosion which took place in Section 1 occurred after the island had formed, and that the accretions making up Cook's point had formed to this island rather than to the right descending bank of the stream. While the lay witnesses called by the defendant testified at length that islands do form in the Arkansas River in the vicinity of the area in controversy as a result of trees and debris settling in the river, none of them undertook to say that as a matter of fact Cook's Point was formed as an island. The sum total of their testimony was to the effect that it was formed either as an island or as an accretion to Section 8, and that they could not tell and did not think anyone else could tell which hypothesis was correct.

■ The burden, of course, is upon the plaintiff to establish his title to the area in controversy by a preponderance of the evidence, and in order to prevail at all in this case it is incumbent upon him to establish that Cook's Point formed as accretion to original Section 8. This is true because he derives his title from Governor Lowden who had record title to the various parts of Section 8 mentioned in the findings of fact, but who had no title at all to any part of original Section 1 on the opposite bank of the River.

■ After considering the depositions of the witnesses, the maps, and the briefs we have come to the conclusion that the plaintiff has sustained his burden of proof as to the nature and origin of the area in controversy, that is to say that Cook's Point was formed as true accretion to Section 8. This being true, it follows under the decisions of the Supreme Court of Arkansas that record title thereto is vested in the plaintiff. Wallace v. Driver, 61 Ark. 429, 33 S.W. 641, 31 L.R.A. 317; Perry v. Sadler, 76 Ark. 43, 88 S.W. 832; Bush v. Alexander, 134 Ark. 307, 203 S.W. 1028; Gray v. Malone, 142 Ark. 609, 219 S.W. 742; Knight v. Rogers, 202 Ark. 590, 151 S.W.2d 669; Horne v. Howe Lumber Co., 209 Ark. 202, 190 S.W.2d 7; and Crow v. Johnston, 209 Ark. 1053, 194 S.W.2d 193. See also the following decisions of the Court of Appeals for this Circuit in which the Arkansas law of accretion and reliction and the related problem of tax payments on accreted lands are fully discussed. Anderson-Tully Co. v. Wineman, 5 Cir., 272 F. 81; Chicago Mill & Lumber Co. v. Tully, 130 F.2d 268, 269; Anderson-Tully Co. v. Murphree, 153 F.2d 874; and Anderson-Tully Co. v. Chicago Mill & Lumber Co., 175 F.2d 735; and see also our own decision in Banks v. Chicago Mill & Lumber Co., D.C., 92 F.Supp. 232.

■ The law in Arkansas, as laid down in the cases above cited, is that where accretions build up to a riparian shore, they become the property of the riparian owner even where they extend into and completely occupy the geographical area formerly occupied by the lands of an opposite riparian owner, which lands have been destroyed by erosion, and that if a subsequent avulsion takes place which severs the accretion from the riparian shore to which it was originally attached, this works no change of ownership, and title to the accretion remains in the riparian owner to whose lands the accretion was originally attached. Further, where a navigable stream is the boundary between two counties, such as Arkansas and Desha Counties in the instant case, an avulsion of the stream does not affect the boundary line between the counties which line remains in the center of the old channel. State of Arkansas v. State of Tennessee, 246 U.S. 158, 159, 38 S.Ct. 301, 62 L.Ed. 638; Banks v. Chicago Mill & Lumber Co., supra; cf. Crow v. Roane, 86 Ark. 172, 110 S.W. 801. Nor does such an avulsion change the boundaries between private owners. Desha v. Erwin, 168 Ark. 555, 270 S.W. 965.

Counsel for the defendant have cited cases from other jurisdictions to the effect that where land is destroyed as a result of erosion and thereafter re-appears by any process whatsoever within the original lines of the former owner, the re-appearance redounds to the benefit of such former owner and he becomes the owner of the restored lands. This rule is not the law in Arkansas, although it is to be noted that Chief Justice Bunn filed a dissenting opinion in Wallace v. Driver, supra, in which he took the position that it should be.

In reaching our decision as to the nature and origin of the area in controversy and that it is presently located in Desha County we have assumed that these questions are open to us for decision. We are not unmindful of the contention of the defendant that the various decrees of the Chancery Court of Arkansas County, set up in his pleadings, foreclose inquiry on these points. While there may be merit in his contentions in this respect, we have, as indicated above, reached a result which renders it unnecessary to pass upon the effect, if any, to be given these decrees in the instant case.[3]

■ Since we have found that the lands involved in this case are in Desha County, it follows that the various tax forfeitures in Arkansas County upon which defendant relies were invalid, and that record title to the area in controversy is in the plaintiff. This being true, the defendant, if he is to prevail at all, must do so upon the strength of adverse possession of himself and his predecessor, Charles F. Willey, and the burden is upon him to establish such adverse possession by a preponderance of the evidence. Lollar v. Appleby, 213 Ark. 424, 210 S.W.2d 900; Howell v. Baskins, 213 Ark. 665, 212 S.W. 2d 353; Robeson v. Hicks, 214 Ark. 595, 215 S.W.2d 1017. We are convinced that the defendant has met this burden.

■ The seven year statute of limitations, supra, does more than bar an action by a plaintiff who has remained quiescent for the statutory period; the operation of this statute vests title in the adverse possessor, and the title so vested is a fee simple title, and is as good a title as one derived by grant from the original owner or from the sovereign. Smart v. Murphy, 200 Ark. 406, 139 S.W.2d 33; Stricker v. Britt, 203 Ark. 197, 157 S.W.2d 18; Hart v. Sternberg, 205 Ark. 929, 171 S.W.2d 475; see, also, 1 Am.Jur., "Adverse Possession," 793, which is cited with approval in Smart v. Murphy, supra.

■ The Supreme Court of Arkansas has often listed the requisites of adverse possession; in order to divest the record owner of his title the possession of the adverse claimant must have been actual, open, notorious, hostile, exclusive, and continuous, and must have been accompanied by an intent to hold against the true owner. Among the decisions, see Watson v. Hardin, 97 Ark. 33, 132 S.W. 1002; Terral v. Brooks, 194 Ark. 311, 108 S.W.2d 489; U. S. Bond & Mortgage Co. v. Reddick, 199 Ark. 82, 133 S.W.2d 23; Smart v. Murphy, supra; Stricker v. Britt, supra; Davis v. Strong, 208 Ark. 254, 186 S.W.2d 776; McCulloch v. McCulloch, 213 Ark. 1004, 214 S. W.2d 209.

■ In determining whether or not a claimant has been in adverse possession of a tract of land for the requisite period of time the possession of his tenant is considered as his own; Cox v. Daugherty, 62 Ark. 629, 36 S.W. 184; McComb v. Saxe, 92 Ark. 321, 122 S.W. 987; Haynes v. Clark, 196 Ark. 1127, 121 S.W.2d 69; Birdwell v. Davis, 206 Ark. 445, 175 S.W.2d 992; Howell v. Baskins, supra. And a tenant in possession under a landlord claiming under one title may not, without yielding possession, acquire a title hostile to that of his landlord or do anything to adversely affect the landlord's title and possession; nor may he attorn to a title adverse to that of his landlord even though such title is a better title than that of his landlord. Simmons v. Robertson, 27 Ark. 50; Burton v.

3. One of the decrees relied upon by defendant was rendered in the case of Bass v. Willey. The decision of the Chancellor in that case was affirmed on narrow grounds by the Supreme Court of Arkansas. Bass v. Willey, 216 Ark. 553, 226 S. W.2d 980.

Gorman, 125 Ark. 141, 188 S.W. 561; Davis v. Grobmyer, 132 Ark. 11, 199 S.W. 917; Casey v. Johnson, 193 Ark. 177, 98 S.W.2d 67; Ray v. Stroud, 204 Ark. 583, 163 S.W. 2d 173; Billingsley v. Lipscomb, 211 Ark. 45, 200 S.W.2d 510; Bolin v. Drainage District No. 17, 206 Ark. 459, 176 S.W.2d 143; Bass v. Willey, supra.

■ ■ While most of the cases just cited deal with attempts of tenants to obtain titles for themselves adverse to those of their landlords, Simmons v. Robertson and Davis v. Grobmyer involved situations where the tenants undertook to attorn to claimants having titles adverse to those of their landlords. In both of those cases it was held that such attempted attornments were void. The general rule on this subject is stated thus in 51 C.J.S., Landlord and Tenant, § 277b: "Subject to a few exceptions * * * the general rule is that a tenant, without surrendering possession to his original landlord, may not attorn to a stranger and that such attornment is void and in no way affects the possession of the landlord, and a tenant by his attempt so to attorn becomes a trespasser. * * *

"Stated in another form, the rule is that a tenant in possession under one title may make no valid attornment to one not in privity with that title although the attornee is the owner of the land or has other paramount title." A statement in accord with this enunciation of the rule is found in 32 Am.Jur. "Landlord & Tenant," Section 110, page 116.

Now, there is no question that at some time T. P. Bass actually went into possession of the area in controversy and that he remained in possession thereof continuously up until the time that this suit was filed. There are questions, however, relating to the time that he went into possession, whose

tenant he was, the notoriety and hostility of his possession with respect to Lowden, and the effect, if any, of his attempted attornment to Lowden in 1931, and of the cutting and removing of the timber by Chicago Mill & Lumber Co. in July and August of 1937.

■ We are convinced that Bass went into possession of the area in controversy on behalf of his son sometime prior to October 20, 1930. In this connection Bass testified that he did not take possession or build his fence or fences until after he obtained his lease from Governor Lowden on June 15, 1931. We are unable, however, to accept his testimony on this point. In the first place, the lease from Charles F. Willey to Bass refers to the enclosing fence as being already in existence, and this lease was executed almost seven months before the lease from Lowden to Bass was made. While the plaintiff seeks to cast doubt upon the question of whether or not Bass' deed to Charles F. Willey and the lease from Willey to Bass were intended to cover the area in controversy, we are satisfied that they were. Willey paid $1,000 to Bass for the Guardian's deed covering land south of Moody's Old River, which is the area in controversy, and, as a matter of fact, Bass testified in the Chancery Court of Arkansas County in the trial of the case of Bass v. Willey to the effect that Willey was supposed to be getting land on the south bank of Moody's Old River when he obtained the guardian's deed.[4] Furthermore, J. H. Hilliard testified that in 1947 when a Mr. Kramer was making a survey for the Receiver in the Bass-Willey litigation, Bass interfered with the surveying party of which witness was a member, and in the course of the conversation between Bass and the surveying party the former stated

4. Defendant called as a witness the Court Reporter who reported the trial of Bass v. Willey, and the reporter read from his notes a portion of Bass' testimony in that trial as follows:

"Q. You say he (referring to Charles F. Willey) was on the ground there designated on the map as Fractional Section One? A. No, he was on the north bank of the river; the land he was sup-

posed to be getting was on the south bank.

"Q. Well, did you make a deed to him? A. We made a quit claim deed, yes, sir. —A quit claim deed.

"A. Yes, sir, and the deed was to cover the land on the south bank of the river and nothing further.

"Q. On the south bank of the river? A. The south bank of the old river, where it is designated as one-eight-four."

that he was not running the party off of his own land but off of "Anderson-Tully land" [5] and when asked where the land was that he had sold to Willey, he pointed toward Cook's Point. In the second place, the map made by F. M. Quertermous in May of 1931, almost exactly one month prior to the date of the Lowden-Bass lease, clearly depicts both of the Bass fences as being in existence at that time. This map shows a system of fences completely enclosing the area in controversy, and we accept it as being accurate with respect to the physical characteristics of the ground surveyed and the fencing thereon, although we do not accept the surveyor's efforts to reestablish certain original lines of Section 1 and to allocate accretion to that Section. From the foregoing it is evident that Bass was in the actual possession of the area in controversy as the tenant of Charles F. Willey on October 20, 1930,[6] and he had no right to oust Willey from possession by recognizing the Lowden title and taking a lease from Governor Lowden. When the Lowden lease was taken, there was no visible change in Bass' possession of the area, and Willey had no notice of this lease.[7] Although the Willey-Bass lease had a primary term of one year, that lease specifically provided that any holding over by Bass should be deemed the possession of Charles F. Willey. While Bass testified that he did not take the Lowden lease until after the primary term of the Willey lease had expired, he is clearly mistaken on this point, as well as on the other point which we have mentioned, for the primary term of the Willey lease expired in October of 1931 whereas the Lowden lease was taken in June of 1931.

Plaintiff suggests that the Bass fences on Cook's Point had just been built when the Quertermous survey was made and that when they were built Bass had orally arranged for the lease from Governor Lowden, but that the agreement had not been reduced to writing. There is no evidence in the record to support this suggestion, and, furthermore, as stated in footnote No. 6, supra, a study of the Quertermous Map in connection with Bass' testimony as to the situation existing when he built his first fence connecting the north and south prongs of the old river (which fence then efficaciously enclosed the area in controversy) indicates that said fence had been built a substantial period of time prior to the making of the Quertermous Map. This map shows the Arkansas River, at that time, running a substantial distance southwest of the cutoff channel of 1926, as located by the plaintiff's expert witness, Major Smith.

The actual possession of Bass of the area in controversy prior to his taking a lease from Governor Lowden charged the latter with notice not only of the fact of Bass' possession but also of the title under which he was in possession. Hughes Brothers v. Redus, 90 Ark. 149, 118 S.W. 414; Smith v. Southern Kraft Corporation, 203 Ark. 814, 159 S.W.2d 59; Stricker v. Britt, supra. While the rule that actual possession of land is notice to the world of the fact of possession and of the title under which possession is held finds its most frequent application in cases of vendor and purchaser, it is not confined to such cases, as is demonstrated by the hold-

5. Evidently land owned or controlled by the Anderson-Tully Co., a large lumbering concern doing business in eastern Arkansas and other states.

6. It is clear that Bass went into possession of this area prior to October 20, 1930, but on the evidence now before us we are not able to say how long prior to that date his possession began. An examination of the Quertermous Map, however, in connection with portions of Bass' testimony relative to the physical situation existing when he built his first fence, and a comparison of the position

of the river as shown on that map with the position which it must have occupied at the time Bass built his first fence indicate the probability that the possession of Bass began at a date very substantially earlier than October 20, 1930; but, as stated, the evidence now before us is too indefinite to justify a finding of possession at any specific date earlier than October 20, 1930.

7. A copy of this lease was introduced in evidence, but there is no indication that the lease was ever recorded either in Desha or Arkansas County.

ing of the Supreme Court of Arkansas in Stricker v. Britt, supra.

In that case, Stricker, a resident of Mississippi, owned Arkansas lands; in 1930 Britt went into possession of a portion of Stricker's lands and put them in cultivation, which cultivation was continued until suit was filed against him in 1938. Stricker did not visit the lands involved and had no actual notice of the possession of appellee until 1936 when he came to Arkansas to redeem some of his land from delinquent tax sales and found that Britt had assessed some of his lands in his own name. Stricker took no action, however, until 1938 at which time he filed suit. The Supreme Court, in affirming a judgment for Britt, said: "* * * no special notice to appellant of the adverse claim of appellee was necessary, and the general rule as to notice of adverse possession, which is well established in this state, is applicable. In the case of Waller v. Dansby, 145 Ark. 306, 224 S.W. 615, we quote the fourth syllabus: 'Whatever puts a party on inquiry amounts to notice where the inquiry becomes a duty and would lead to knowledge of the requisite fact by the exercise of ordinary diligence and understanding'. We quote the second syllabus in the case of Hughes Bros. v. Redus (supra) as follows: 'One's actual possession of land is notice to the world of the title under which he claims' ".[8]

In Clements v. Fuller, 209 Ark. 849, 192 S.W.2d 762, a tenant in possession had renewed his lease by means of an exchange of letters between himself and his landlord for an additional term of one year; appellee later bought the land from the former owner and had no notice of the renewal of the lease. The Supreme Court in reversing a judgment for the appellee in a suit for possession of the premises held that the tenant's possession charged the plaintiff with notice that tenant's term had been extended. The Redus case, supra, was quoted as follows: "Because the defendant was in the actual and visible possession of the property when plaintiff purchased, if it did not seek the defendant to learn the nature of his claim and title, the law makes the plaintiff take notice of that title." [9]

In the recent case of Dean v. Freeze, 213 Ark. 264, 267, 209 S.W.2d 876, 877, the statement in the Redus case that "One's actual possession of land is notice to the world of the title under which he claims", was expressly mentioned. [10]

While there is no testimony in the record to the effect that Governor Lowden or his agents had actual notice of Bass' possession prior to June of 1931, the physical facts and circumstances shown by the evidence indicate a very strong probability that Bass' possession was known to Lowden's agents or would have been known to them had they exercised ordinary care in looking after their employer's property.[11]

8. 203 Ark. 197, 208, 157 S.W.2d 18, 23.

9. 209 Ark. 849, 851–852, 192 S.W.2d 762, 764, citing numerous earlier Arkansas cases.

10. Hughes Brothers v. Redus was decided in 1909; it was a vendor and purchaser case, the plaintiff having purchased the land from the record owner who had previously conveyed it to defendant who was in possession. The Court in rejecting plaintiff's contention that it was an innocent purchaser for value said: "Actual possession of the lot by defendant was notice to the plaintiff, and all the world of his title. It was not necessary for defendant to place his deed on record to give plaintiff notice of his title. When plaintiff purchased the lot, the defendant was in possession of it, and the law imputed to the plaintiff, under such circumstances, notice of whatever right * * * or equity the defendant had in the property. * * * Because the defendant was in the actual and visible possession of the property when plaintiff purchased, if it did not seek the defendant to learn the nature of his claim and title, the law makes the plaintiff take notice of that title." 90 Ark. 149, 151–152, 118 S.W. 414, 415.

11. Governor Lowden himself lived in Illinois and there is no indication in the record here that he himself visited his Arkansas lands after the 1926 avulsion which cut Cook's Point off from the other lands which he owned in Desha County. The evidence does show, however, that prior to the avulsion he kept his lands patrolled to protect the timber, and after the avulsion his interests were looked after by local agents. Plaintiff's own

There was nothing secret about Bass' possession prior to the Willey lease and between the time of execution of the Willey lease and of the lease he obtained from Governor Lowden in 1931. Bass himself testified that he built a fence on the bluff bank of the river after the avulsion, which connected the north and south prongs of the old river, which fence would have been clearly visible from the opposite bank of the river where the other Lowden lands were located. Then, later on and after the river had migrated westward away from its original cut-off channel and the ends of the prongs of the old river had started to "silt up", he built another fence running from the south prong of the old river down to the channel of the river as it then ran. The Quertermous Survey shows this fence running for a considerable distance across an open sandbar and down almost to the water's edge where it connected with another fence running in a northwest direction, which, in turn, connected with a third fence running for a considerable distance in a northeasterly direction and finally terminating at a point north of the old river.[12] Had Governor Lowden's agents looked across the river to Cook's Point there was nothing to prevent them from seeing these fences, and had they ever crossed the river to Cook's Point, they could not have avoided seeing the fences and the cattle grazing upon the Point. The knowledge of his agents would be imputed to Governor Lowden.

Lowden being on notice of Bass' possession and the title under which he held, is bound by the same rule which prevented Bass from acquiring a title himself adverse to Willey. This principle is clearly recognized in Davis v. Grobmyer, supra, and cases there cited. The attempt to oust Willey was nugatory and his adverse possession, through his tenant Bass, continued after the execution of the Lowden-Willey lease.

In holding that the attornment from Bass to Lowden was nugatory and did not affect Willey's possession, we of course, apply the substantive law of Arkansas, and in this connection we call attention to the unreported decision of Honorable A. P. Steel, one of the Chancellors of the Sixth Chancery District of Arkansas, in the case of Guinn v. Reed, Miller County Chancery Case No. 8987, from which no appeal was prosecuted, and in which case the Court was confronted with a problem of attornment practically identical with the one now before us. Judge Steel has given long and distinguished service to this State both as a Circuit Judge and as a Chancellor, and his considered opinion on a question of Arkansas law is evidence of what the Arkansas law on that question is.

In the Guinn case the defendant, Reed, went into possession of certain lands in 1939 with intent to acquire title thereto; he remained on the land himself about a year and then installed his father thereon as his tenant. He had no title or color of title and simply took advantage of an abandonment of the record owner. The plaintiff, Guinn, obtained a void tax title to the land prior to 1940. Thereafter, plaintiff visited the land, found defendant's father thereon and took from him a rent

testimony indicates that Governor Lowden was a careful man in matters of business and that he took considerable interest in timber conservation and culture on his Arkansas lands.

12. At the time of the Quertermous Survey, Bass owned or claimed to own Section 36, Township 7 South, Range 4 West which was north of Moody's Old River, and he had also claimed to own certain lands just south of Section 36 and north of the old river which lands occupied a portion of the geographical area for-

merly occupied by part of original Section 1 and which lands had been restored by the migrations of the River between 1884 and 1917; these restored lands were covered by Bass' deed to Willey in 1930 and in the lease from Willey to Bass, but they are not in controversy here as they are not within the confines of Moody's Old River; it was Bass' threat to cut timber from these restored lands after the Willey lease that gave rise to the litigation between Bass and Willey which has been referred to.

note in the sum of $10, which was never collected and was never intended to be collected. This rent note was taken sometime in 1940. In 1946 plaintiff ordered defendant's father to quit, which the latter refused to do, and plaintiff sued in ejectment, naming the defendant as a party to the suit. His theory of the case was that he had been in adverse possession of the land through the tenant for more than two years and that the two-year statute of limitations, note No. 2, supra, was applicable. The case was transferred to equity and there tried. Judge Steel upheld, as against plaintiff, the defendant's plea of adverse possession for seven years and cancelled Guinn's tax title. In his memorandum opinion to which we have referred and which is part of the record in that case, Judge Steel said:

"The Court is of the opinion, since Andrew Reed actually took possession of the property and made necessary repairs on the fences and used it for a stock ranch during the whole of the time the land was claimed by the plaintiff, that the mere fact that his father gave the rental note without the knowledge and consent of the son who put him in possession would not affect the claim of the defendant and the title of adverse possession claimed by the plaintiff could not exist.

"Therefore, it is the opinion of the Court that the tax title was void and that Guinn got no title by virtue thereof nor did he obtain possession from a tenant of Andrew Reed by virtue of the alleged Ten ($10.00) Dollar note given for the rental and the Court is of the opinion that the Plaintiff's Complaint should be dismissed for want of equity."

It is to be noted from this decision that it was squarely held that defendant's claim of adverse possession was not affected by the giving of a rent note to the plaintiff by defendant's tenant. So here, the adverse possession of Willey was not affected by Bass' entering into a lease agreement with Lowden of which Willey had no notice.

As stated there was no notice to Willey of Bass' attornment to Lowden and no visible change in the possession of the area in controversy at the time of this attempted attornment to Lowden, and as far as Willey was concerned Bass remained on the land as his tenant. This situation prevailed up until the summer of 1937 when the Chicago Mill & Lumber Co., acting under a grant from Governor Lowden, cut and removed the timber from Cook's Point without objection from Bass or Willey. The evidence shows that Lowden sold the timber to Chicago Mill & Lumber Co. sometime in 1936, and that the latter cut and removed the timber during the months of July and August of 1937, the cutting and removing being completed by August 18, 1937.

As stated in the findings of fact, supra, there is no evidence that Charles F. Willey had any actual notice that Chicago Mill & Lumber Co. had cut and removed the timber from the land; on the other hand, the evidence to the effect that Mr. Willey was a man of advanced years, was in poor health, and was absent from the state during that period of time tends to negative the idea that he had any actual knowledge of the cutting and removing. Assuming, however, without deciding that the actions of Chicago Mill & Lumber Co. in cutting and removing the timber were so substantial and notorious as to charge Willey with constructive knowledge thereof, and assuming further, without deciding, that these activities amounted to a re-entry by Governor Lowden which interrupted Willey's adverse possession, it does not follow that they validated Bass' attornment to Governor Lowden or ousted Willey from his adverse possession, and we hold that after the completion of said activities Bass remained the tenant of Willey, and that the statute again began to run in favor of the latter, and that his title was ripened in 1944.

While we have found no case, either in Arkansas or from any other jurisdiction, which has presented the precise factual situation before us in the instant case, the

decision of the Supreme Court of Arkansas in Cotton v. White, 131 Ark. 273, 199 S.W. 116, is persuasive. There it was held that an attornment to a tax purchaser by one who had been in possession of lands as a tenant of the record owner was unavailing to oust the latter and put the tax purchaser in possession even where the tax purchaser had placed improvements on the land. The basis of the holding was that the tenant's attornment lacked notoriety even though accompanied by the tax purchaser's acts in putting improvements on the property. We have already seen in the instant case that Willey had no notice of the Lowden-Bass lease, and we do not think he was put on notice of it by the cutting and removing of the timber. If the construction of improvements on land by a tax purchaser is not sufficient notice of an attornment by a tenant in possession, it would not seem that a cutting and removing of timber, which are acts of no greater dignity than the construction of improvements, would apprise Willey that his tenant had violated his trust and attorned to a rival claimant. The mere fact that Bass did not prevent the cutting and removing of the timber would not charge Willey with notice of an attornment because in the summer of 1937 Bass was not in a position to prevent these acts, Willey's title not having ripened by that time, unless, indeed, the two year statute of limitations had become operative, a point which we do not decide.[13]

It follows from the foregoing that the plaintiff's complaint must be dismissed for want of equity, and that the injunction heretofore issued by us restraining the defendant and his employees from doing further fencing on the area in controversy will be dissolved. While defendant has not filed any cross complaint seeking to have his title quieted, we hold, nevertheless, that the funds in the registry of the Court should follow the title, which we have found to be in the defendant.

As to the costs in this case, we desire to point out that the litigation has presented numerous difficult questions; while the plaintiff doubtless filed his action in the utmost good faith, nevertheless the defendant's predecessor also appears to have acquired his title in good faith and always believed that he was the owner of the area in controversy. As evidence of his good faith he, in 1930, paid $1,000 for this land, a sum which in those days was much more substantial than it is today. Strong arguments can be made on both sides of this case, and the questions involved have not been easy to decide. We think that, from a purely moral and ethical standpoint, one of the parties is in as good position as the other, and under such circumstances we do not think that either should be penalized as a result of this litigation. This being true it will be our order that each party bear his own costs.

A decree in accordance herewith will be entered.

13. Unquestionably, more than two years had elapsed between October 20, 1930 and the time that the timber was cut and removed, and if the tax deeds to T. P. Bass, Jr., issued in 1928, were valid on their faces, the two year statute would have completely operated to vest title in Willey, Bass' successor, even though the tax sale which was the basis of the deeds was void. Baum v. Yarberry, 212 Ark. 471, 206 S.W.2d 190. On the other hand, if the deeds themselves were void for insufficient description the two year statute is inapplicable. Woodall v. Edwards, 83 Ark. 334, 104 S.W. 128; Halliburton v. Brinkley, 135 Ark. 592, 204 S.W. 213; Kennedy v. Burns, 140 Ark. 367, 215 S.W. 618; Goodrich v. Darr, 161 Ark. 514, 256 S.W. 868. The problem which we do not find it necessary to reach, is whether or not the use in Bass' tax deeds of the obsolete descriptions "Frl. NW¼ of Section 1, Township 8 South, Range 4 West," and "Except Frl. NW¼, Frl. All of Section 1, Township 8 South, Range 4 West", which descriptions had ceased to identify land in place, Wallace v. Driver and Banks v. Chicago Mill & Lumber Co., both supra, were so defective as to render the deeds void on their face.