## KIMBLE v. WILLEY.

No. 14435.

United States Court of Appeals
Eighth Circuit.

Sept. 8, 1952.

Bruce T. Bullion, Little Rock, Ark. (Bailey & Warren, Little Rock, Ark., on the brief), for appellant.

John W. Moncrief, Stuttgart, Ark. (Virgil R. Moncrief, Stuttgart, Ark., on the brief), for appellee.

Before JOHNSEN, RIDDICK and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

The record owner of some land in Arkansas sought to quiet title against an adverse claimant but was denied relief upon the ground that legal title to the property had become vested in the defendant by adverse possession.

Defendant's adverse possession was claimed to rest (among other elements, which the trial court deemed it unnecessary to take into account) upon the entry made and possession taken in his behalf by a third party as his tenant, under a lease given by him to such third party for the period from October 29, 1930 to October 29, 1931, and upon an alleged holding over by the

tenant thereafter, down to the institution of this suit in 1948.[1]

The property involved consisted of river timber-land, which the tenant desired to use for the pasturing of cattle. Neither defendant nor his tenant ever lived upon the land, and the presence of the tenant's cattle, with the fencing done and maintained to effect an enclosure of the property in conjunction with its natural barriers, constituted the essence of the occupancy. The lease had obligated the tenant to keep up fences and to exclude trespassers. It further provided that, if the tenant continued in possession after the expiration of his lease, "the possession shall be that of the (lessor)."

On June 15, 1931, while the original term was still in effect, the tenant undertook to make an attornment to the record owner, by soliciting and obtaining from the latter a lease, which ran to June 15, 1932. As in the case of his lease with defendant, the tenant never made any formal renewal of this lease. Nor did he ever make any rental payments to either of his two landlords, except for the one-year period which each lease respectively covered. As a matter of fact, the rent provided for in both leases was a purely nominal amount. In 1936, the record owner entered into a contract with a Lumber Company for a sale of part of the timber upon the land, and the Lumber Company went upon the property and carried out these logging operations during 1937. Defendant did not personally know until 1947 of the attornment which his tenant had made to plaintiff in 1931 or of the timber-cutting operations carried out by the Lumber Company under authority from plaintiff in 1937.

The trial court held that the attempted attornment of defendant's tenant to the record owner in 1931 had not disrupted or affected the hostile entry and adverse holding which the tenant had theretofore established in defendant's behalf. The court however did not pass upon the question of whether the record owner's entrance upon the property in 1937, through the timber-cutting operations of the Lumber Company, had effected a break in defendant's adverse possession at that time, as constituting from the nature of the property and the use made of it by the tenant an ouster of the previous occupancy. The court declared that, even if it were assumed that this incident had had such a result, there nevertheless had existed seven years—the period of general limitation under Ark.Stats. § 37–101— of open, notorious, hostile and exclusive occupancy thereafter on the part of defendant through the tenant, and that this occupancy, from 1937 to 1944, had caused legal title to the property to become vested in defendant by August 18, 1944.

■ But while resting defendant's adverse possession entirely upon this seven-year period, and while assuming that an ouster of the previous occupancy may have occurred, the court did not undertake to consider the question of the hostile entry or taking possession which would then again have had to be accomplished, in order to commence a running of the statute of limitations as of that time, but seemingly treated the situation as constituting simply one of continuation of the elements

---

1. Actually, the lease was made by defendant's devisor, who thought he had become owner of the land on the basis of a conveyance from a purported purchaser at some tax-sale proceedings, which proceedings the trial court declared to be void. Also, the record title at that time was held by plaintiff's predecessor in interest. These and other details of the factual situation, however, are without importance on the legal questions by which the appeal is controlled. A full and careful statement of the facts appears in the Findings, Conclusions and Comments of the trial court, reported in Kimble v. Willey, D.C.E.D.Ark., 98 F.Supp. 730. The findings of fact made are all supported by sufficient evidence in the record, so that they cannot as such be attacked here. To bring the legal questions controlling the appeal to as prompt a focus as possible, we have simplified the situation by compressing many of its factual details. Thus, for example, we are here taking the liberty of using the terms plaintiff and defendant to refer not merely to the immediate parties to the litigation but to the predecessors of their respective legal interests as well.

and conditions of the tenant's 1930 entry, and as thus amounting to one where the statute would be as much capable of commencing to run at one time as at another. The basis of the court's implied view, that the elements and conditions for such hostile entry or taking possession as might again be necessary to be effected had remained unchanged, was its holding, referred to above, that, since under the law of landlord and tenant a tenant may not deny his landlord's title, the tenant's attempted attornment to the record owner in 1931 had not operated to disrupt defendant's then-existing status of adverse possessor of the property, and its apparent concept that the ineffectiveness of the attornment to touch these rights would also extend to any retaking of possession which might be done by the tenant, in case his occupancy was disrupted by the owner of the property.

Whether, under Arkansas law, the adverse possession of property is incapable at all of being broken by the record owner through his obtaining of an attornment to himself from the party in actual possession, if such party chances to be in possession as the agent-tenant of a third party, regardless of whether the record owner has any knowledge or reason to believe that this is the situation, we shall later discuss.

Assuming for the moment that the trial court's appraisal of Arkansas law in this respect was correct, the adverse possession of defendant, instituted through the tenant's hostile entry and taking possession against the record owner in 1930, would of course be entitled to be regarded as continuing in its original elements and conditions down to the re-entry made by plaintiff under the timber-cutting operations of the Lumber Company, begun in July, 1937, and completed by August 18, 1937. But if this re-entry by plaintiff effected a repossession of the property and an ouster of defendant and his tenant from their occupancy, as the court assumed in its disposition, the situation stood, in concept of adverse-possession law, as if no hostile entry or taking of possession ever had occurred. Any taking of possession thereafter, capable of effecting another disseisin of plaintiff, would therefore just as much

have to met the necessary tests of a taking of possession under the substantive elements of adverse-possession law as if the entry and occupancy of 1930 had never been made.

In other words, even though the law of landlord and tenant were to be regarded as preventing the tenant's attornment to plaintiff from having had any effect upon the hostile entry and holding which he had previously established in favor of defendant by having gone into possession of the property solely on the basis of his authority from defendant and having thereby fully consummated the relationship of landlord and tenant between them, it would not automatically follow that this protective principle of estoppel was entitled to be extended to mean also that, even if such an attornment to the record owner had occurred before the tenant actually took possession, his entry upon the property made thereafter would no less have to be regarded as hostile to the record owner because of the existence of his lease with defendant.

To hold that an entry into possession of property by the tenant of an adverse claimant, made after the tenant has also attorned to the record owner and has thus obtained the latter's consent to his entry and occupancy, should, despite the existence of such a consent from the owner, nevertheless be regarded as hostilely effecting a disseisin of the record owner for limitation purposes, because of the principle of landlord-and-tenant law that a tenant cannot deny his landlord's title, is to make a regulation of third-party collateral relationship dominant over the prerogatives of actual ownership; to accord favoritism and facilitation to usurpation over ownership, provided that the situation is one in which the usurper is resorting to the use of an agent to carry out his usurpation instead of undertaking all the necessary steps personally; to fail to effect that reasonable reconciliation or compromise, which is always necessary between crossing principles in the different fields of the law, on the basis of fundamentality and total consequences; and to permit the secondary field of landlord-and-tenant relationship to

create tangentially in the primary field of title-divestiture a new substantive element —that of constructive hostility in the making of entry upon or taking of possession of another's property as a means of effecting a limitation holding.

We can find no recognition in the adjudicated law of adverse possession of any such legal artificiality as constructive hostility in the making of entry upon or the taking of possession of another's property. Disseisin is not a state of imported conditions but of objective realities. The effectiveness of an entry or a taking of possession to set the statute of limitations in operation against the owner of a piece of property therefore necessarily depends upon whether the person by whom it is done has in fact made the entry or taken the possession as an invasion of the owner's rights and not upon what he may have obligated himself to do in this connection as a matter of relationship to some third party. Entry made or possession taken under permission sought and obtained from the owner of the property by the person actually making the entry or taking the possession cannot objectively be said to constitute one of hostile invasion, and this reality no less exists as a fact whether such person in making the entry or taking the possession is acting for himself or acting for another.

One who entrusts to another the making of an entry upon property in his behalf, for the purpose of setting the statute of limitations in operation against the owner, or a going into possession of such property in his behalf, as a means of continuing the operation of the statute against the owner, is in his attempt to accomplish this object simply resorting to and relying upon the instrumentality of agency to carry out his desired aim of impact against ownership, and in the entrustment to another of that representation of himself he would not seem logically or equitably to be any more entitled to be shielded from the consequences of what his agent may do or fail to do in his performance than is any other principal. And on that basis, there would be no room to claim any difference in the nature or effect of what such an agent actually has done in order to gain entry onto or to obtain possession of the property, as a question of impact upon existing legal ownership, whether the agent is one who has been given a lease by his principal to occupy the property after making entry or taking possession as a contribution to the principal's course of usurpation, or whether the agent is one who has merely been employed to make entry or take possession in his principal's behalf and immediately turn the property over to the principal, without any right or tenure of subsequent occupancy in himself. In either case, the entry or taking of possession will possess in fact only such attributes of hostility to the owner's rights as the agent's actions actually have had. To say that an act of going into physical possession of property can unfurl a different standard than the flag which the person taking the possession has actually used and displayed to the world in what he has done would be striking at the very base of adverse-possession concept.

In this connection, it might also be incidentally observed that making entry upon or taking possession of premises demised is not a general obligation of the lessee under the substantive law of landlord-and-tenant relationship. See 32 Am. Jur., Landlord and Tenant, § 198, p. 187. Such an obligation may be created by specific covenant or provision in the lease, but even then the making of entry or taking of possession cannot be compelled as a matter of specific performance and the covenant or provision does no more than give rise to remedy in breach or rescission. Thus, even where the lease is one given by the legal owner, possession of the tenant does not exist as a fact until such possession has actually been taken by him.

But without regard to this, it is obvious that, where one has entrusted to another the making of entry upon or taking of possession of property in his behalf, for the purpose of starting the operation of the statute of limitations against the owner, it would not in any event be possible to argue that the statute had been started, if such person, whether he was a lessee or something else, failed to make such entry

or take such possession. Equally, we think that there can be no dispute that the failure of some new tenant to go into possession of property, of which his landlord was an adverse claimant through previous tenant-occupancy, could, if the landlord allowed the lack of actual occupancy to continue for an unreasonable length of time, cause the operation of the statute to be stopped and to cease against the owner.

Just as realistically, it seems to us, as we have above suggested, that in any situation of adverse possession through constructive occupancy, where the adverse claimant is leaving to some other person the matter of going into physical possession of the property in his behalf, whether to initiate or to continue the operation of the statute of limitations, the adverse claimant is unable, on the question of impact against the owner's rights, to escape the nature of the factual elements or ingredients of which that person has made the situation of his going into possession actually consist.

To repeat what has previously been said —in the attempted march of an adverse claimant against legal ownership, his use of another person to go into possession for him as a step in the process of effecting his usurpation is simply the entrustment to an agent of a striking of the proper blow against ownership, and no more blow can exist in fact than the agent has actually struck.

Further discussion, however, of this realistic view would not appear to be necessary in the present situation, for we think that it is one to which the Arkansas Supreme Court has itself given recognition. In Chicot Lumber Co. v. Dardell, 84 Ark. 140, 104 S.W. 1100, the Lumber Company claimed title to some property against Dardell, the record owner, on the basis of adverse possession. It rested its possession upon the occupancy made of the property by Wood and Matthews as its tenants—their lease having included such property as part of the demised premises—and as evidence of this occupancy it relied upon a fence placed by the tenants around the premises. The court, in holding that the Lumber Company had not established a limitation title, used the following as one of the

grounds of its decision: "There is substantial testimony that Wood and Matthews got permission from Dardell, as well as from the lumber company, to build the fence. In that event, their fence would not be hostile to Dardell's title." 104 S.W. at page 1101.

As we have pointed out, the trial court treated the situation here as constituting or being equivalent to one of entry made or possession taken by defendant's tenant on August 18, 1937, after the timber-cutting operations of the Lumber Company had been completed. But as to any entry made or possession taken by the tenant at that time, the tenant then had as much authority from plaintiff as from defendant for going onto the land to pasture his cattle, under the two leases which he had obtained. Thus, such entry or taking of possession by the tenant as was assumed by the trial court to have occurred would have been made no less with the consent of the record owner than with the consent of the adverse claimant and so could not be in fact one of hostility to the record owner's title and therefore was not capable of setting the statute of limitations in operation against him.

What has been said necessarily requires that the judgment of the trial court be reversed, because of the basis on which it was made to rest.

A number of other contentions and theories were urged by defendant in the trial court, upon the evidence adduced, in support of its claim of limitation title, but these were pretermitted by the court in view of the conclusion which it reached. They will of course be open to the court's consideration on remand, if they are necessary to a final decision. Since the subsequent proceedings may perhaps involve a further application by the court of its holding, that an adverse possession of property, once properly instituted, is not at all capable of being broken by the legal owner through his obtaining of an attornment to himself from the party in actual possession, if such party chances to be the tenant of a third-party adverse claimant, regardless of whether the legal owner has any knowledge or reason to believe that this is the situation, it may be advisable, as a means of facilitating ulti-

mate disposition, to examine whether this view of the trial court constitutes a correct appraisal of Arkansas law.

The trial court was unable, as have been we, to find any case, either in Arkansas or elsewhere, making declaration of this broad and absolute principle in a situation of testing rights between the legal owner of property and an adverse-claimant lessor. General statements are contained in texts on landlord-and-tenant law, and in judicial opinions involving attempted attornments to others than the legal owner of the property, to the effect that any attornment by a tenant to a stranger, after he has gone into possession of the property under his landlord's title and while that possession continues, is void. See e. g. 51 C.J.S., Landlord and Tenant, § 277b, p. 933; 32 Am. Jur., Landlord and Tenant, § 110, p. 116; Simmons v. Robertson, 27 Ark. 50; Burton v. Gorman, 125 Ark. 141, 188 S.W. 561; Davis v. Grobmyer, 132 Ark. 11, 199 S.W. 917—upon which authority the trial court relied.

A landlord-and-tenant relationship, which has become consummated into its intended status by the taking of possession on its basis, has of course an element of general estoppel appeal which goes beyond that of a situation in which the step of making entry or taking possession still remains to be done by the tenant, as we have discussed above. But here too, as in the case of a landlord's entrusting to a tenant the matter of so making entry upon or taking possession of property as to carry out the landlord's personal object of starting or continuing the operation of the statute of limitations, the fact obtains that what the landlord is seeking to accomplish is more than simply to have come into his hands such fruits as the tenant's obligation under the lease and the tenant's inability to repudiate the lease relationship for infirmity in the landlord's title would naturally assure him as to the property. As in the case of his entrustment to the tenant to make entry or take possession in such a manner as to effect a step in the process of his usurpation, the landlord here is making use of the tenant's subsequent occupancy as a vehicle to extend and solidify the course of his tortious hold. Thus, for example, he necessarily is expecting the tenant to make communication of his lessor interest and relationship, on any inquiry by a third party as to the nature or basis of the existing occupancy or possession, where a failure to disclose could produce a situation of estoppel.

But in this dependence upon the tenant to make proper proclamation of his adverse claimant's interest in the property, the landlord is relying, not upon any tenancy duty, but upon a personal representation beyond the obligation of that relationship. No responsibility to speak out or furnish information as to his landlord's interest, for the sake of protecting the landlord, is inherent in the general relationship of landlord and tenant. A tenant may on inquiry make known the interest of his lessor as a means of protecting his own relationship to the property against possible estoppel. But he can also subject his own situation to an estoppel, if he chooses not to give correct or adequate information. And if the situation is one in which the landlord thus has left his adverse-claimant's interest subject to ascertainment by third parties only through inquiry and answer on the part of the tenant as the person in possession, he necessarily has put the tenant in the position of being able to speak in his stead and so of acting as his agent in what the tenant may estoppingly say or fail to say about his rights.

Certainly no one would contend that an estoppel should not be held to exist against the landlord in such a situation from what the tenant might tell one who was purchasing the property from the record owner, who made diligent inquiry as to the basis of the tenant's occupancy, and who relied upon what the tenant told him. And equally appealing as a matter of protective estoppel, it seems to us, would be the position of a record owner, who in an attempt to safeguard himself against the possibility of any threat to his ownership has made diligent inquiry of a party found in possession of the property, who has no other reasonable means of acquiring knowledge as to the basis of that person's occupancy, and who relies and acts upon what the latter has told

him, in the steps taken by him to assure or to restore to himself the full status and complete incidents of his ownership.

In both of these situations, what the tenant may say or do penetrates beyond the question of whether he may thereby in effect be denying his landlord's title. It presents a situation of inducement to take action in relation to property rights, of reliance upon that inducement, of reasonableness in the reliance, of prejudice therefrom, and of estoppel called for as a matter of justice both against the tenant and any other person for whom he has been left in a position to speak. And where the elements of estoppel thus exist against an adverse-claimant landlord, from failure of his tenant to make disclosure of his interest and relationship, the preclusion created to assert his rights can hardly be said to be any different whether the tenant in the situation yields up the property to the legal owner or whether he is permitted to make a proper attornment to the owner and so remain. In both instances, the previous occupancy and the inferior rights of which it has been supportive have come to a legal end.

We do not believe therefore that there exists any basis rationally for carrying the principle that a tenant cannot deny his landlord's title to the extremity of holding, as the trial court did, that an adverse possession of property, once properly instituted, is not at all capable of being broken by the legal owner through the obtaining of an attornment to himself from the party in actual possession, where the situation is one in which such party is in fact the tenant of a third-party adverse claimant—even though the legal owner has no knowledge or reason to believe that this is the situation; even though there exists no reasonable means of learning of the landlord's interest except through the tenant's disclosure; and even though the legal owner has exercised such diligence in dealing with the tenant as the situation reasonably would seem to suggest and has relied upon the information which the tenant has given him, in his attempt to safeguard himself against any adverse-possession usurpation.

We can see no sound reason why the principle that a tenant cannot deny his landlord's title should be allowed to have any such artificial supremacy over all other substantive principles and existing rights in relation to property. Certainly, the protection of ownership is not secondary to the regulation of landlord-and-tenant relationship in the scheme of our property system. Nor has it ever been an object of our legal system to facilitate the wrongful appropriation or usurpation by anyone of another's property. And so the limited field of landlord-and-tenant relationship cannot be regarded as crossing out in legal periphery all the principles of the more general fields of title protection and divestiture, agency capacity and representation, and estoppel concept and operation.

In the light of these considerations, and in the absence of any express declaration by the courts of Arkansas or of other jurisdictions in such a situation supportive of the soundness of the trial court's view, we cannot escape the conviction that the trial court was mistaken in its holding. And this persuasion is the more strong because while, as we have mentioned, there has been no judicial declaration of any such inexorable principle in a situation of testing rights between the legal owner of property and an adverse claimant, either in Arkansas or elsewhere, there have been approaching situations in which the question has been the subject of consideration and expression, and in all of these the courts have refused to adopt the view which the trial court here took.

Thus, in the case of Thompson v. Pioche, 44 Cal. 508, 517–519—where the plaintiff was claiming title by adverse possession on the basis of the occupancy of his tenant Osborne, where Osborne had during his possession made an attornment to the legal owner Moss, predecessor in interest of the defendant, and where an express statute existed providing that "The attornment of a tenant to a stranger shall be void, unless it be with the consent of the landlord of such tenant, or in pursuance to, or in consequence of, a judgment or decree of some Court of competent jurisdiction"—the Cali-

fornia Supreme Court said: "Moss, as already remarked, had no notice that any one, other than (the tenant) Osborne, claimed any adverse right in the land; and he might have commenced an action against Osborne for the recovery of the possession; but it cannot be said that because he failed to do so, and instead thereof attempted to make Osborne—the only person who apparently claimed adversely to him—his tenant, and thus regain the constructive possession, he thereby acquiesced in the adverse possession of the undisclosed landlord of Osborne. It cannot be said that Moss neglected to assert his title against the plaintiff, when he had no means of knowing that the plaintiff claimed anything in the land. There is no rule of law that forbade him to accept as a tenant the only man, who so far as he knew, claimed adversely to him, and compelled him to eject, by suit or otherwise the person in possession, under the vague suspicion that he might be the tenant of some undisclosed landlord. * * * We are of the opinion that the evidence failed to bring home to Moss notice of the plaintiff's claim to the land, and that the possession of the plaintiff, through his tenant, after the attornment of the latter to Moss, was not adverse, in a legal sense, to the title of Moss and those claiming through him, so as to keep the Statute of Limitations running."

In similar vein, the Court of Civil Appeals of Texas, in Louisiana & Texas Lumber Co. v. Alexander, Tex.Civ.App., 154 S.W. 233, 234, observed: "The well-settled general rule is that the continuity of possession of an adverse claimant is not broken by the attornment of his tenant to another, without his knowledge or consent. * * * We are not prepared to say that this rule should apply when the attornment is to the owner of the property, and is obtained by him without any notice that the person in possession, who makes the attornment, is holding under one claiming adversely to him. In order to perfect his title by limitation, the adverse claimant of land must give continuous notice of his claim by a visible occupancy and appropriation of the land for the time prescribed by the statute. He

must in this way keep his flag continuously flying; and while he may do this by tenant, if such tenant lowers the flag by attorning to the owner, who acts in good faith and without notice that the person in possession, who attorns to him, is the tenant of an adverse claimant, it may be that such attornment would break the continuity of the adverse claimant's possession. It would seem that in such case the owner has done all that could be required of him to protect his possession, and that the adverse claimant, who trusted his tenant to assert his claim for him, should suffer the consequences of his agent's infidelity."

Again, in Powell Lumber Co. v. Nobles, Tex.Civ.App., 44 S.W.2d 774, 777, the Texas Court recognized that an attornment to the legal owner by the tenant of an adverse claimant, where the legal owner was without knowledge or notice that the tenant was in possession under the adverse claimant, might break the continuity of the adverse-claimant's holding, but held that in the situation there involved the principle was not applicable, because the evidence showed that the tenant had told the record owner at the time of his attornment to the latter "that he was in possession for (the adverse claimant) and holding the land for him".

Also, in Turpin v. Saunders, 32 Grat., Va., 27, where title by adverse possession was claimed against the record owner by virtue of the occupancy of a tenant, but where the tenant, while in possession, had sought and obtained a lease from the record owner, without any disclosure of the relationship between himself and the adverse claimant, the court, in reversing a judgment in favor of the adverse claimant, said: "The question here does not turn upon the nature and character of (the tenant's) obligations to (the adverse claimant) growing out of the lease. The real point of inquiry is, How was (the record owner) affected by that lease? As has been already said, he was wholly ignorant of its existence. He not only had no knowledge of it, but he had no means of acquiring such knowledge. * * * (The tenant)

was careful to conceal the fact, for by doing so, he succeeded in obtaining the lease from (the record owner). * * * It would be curious, indeed, if a possession thus continued could be relied upon to defeat the title of the party under whom it was held ostensibly, and without whose consent it could not have been so held. * * * (The adverse claimant's) claim of possession is lacking in one of the most essential elements to render it adversary in its character. (The tenant), although in the actual occupation of the premises, did not claim title in himself or in (the adverse claimant). On the contrary, he accepted a lease from (the record owner) and claimed to hold under him."

And the Arkansas case of Chicot Lumber Co. v. Dardell, 84 Ark. 140, 104 S.W. 1100, previously discussed, where the erection of a fence by the tenant of an adverse claimant was held not to effect a hostile appropriation or holding of possession because it had been done with the consent of the legal owner, may again be noted, as at least not indicative of any support for the view of the trial court on the present question.

On the basis of all the foregoing, we believe the sound and general rule to be that, as a matter of compelling estoppel, the principle of landlord-and-tenant law, that a tenant may not deny his landlord's title, cannot operate to prevent the continuity of the hostile possession of an adverse-claimant landlord from being broken by an attornment of his tenant to the legal owner, where the situation is one in which the legal owner is without any knowledge or other notice than the occupancy itself of the relationship between the tenant and the adverse claimant, and where he cannot be said to be guilty of failing to make such inquiry as ordinary diligence in the circumstances of the particular situation would reasonably suggest. And we think that the Arkansas Supreme Court would in all likelihood follow this rule.

The judgment is accordingly reversed and the cause remanded for further proceedings.