## KIMBLE v. WILLEY.

### No. 14435.

United States Court of Appeals
Eighth Circuit.
May 14, 1953.

Johnsen, Circuit Judge, dissented.

States District Court for the Eastern District of Arkansas on December 30, 1948. The action was one to quiet title to certain lands in Arkansas of which the District Court had jurisdiction because of diversity of citizenship of the parties. In addition to the denial of the plaintiff's claim of title and the assertion of his claim of title, the answer of defendant Willey put in issue questions of fact concerning the legal description of the area in controversy, including whether the land was correctly described as within the area of Desha County, Arkansas, as claimed by the plaintiff, or in Arkansas County, Arkansas, as claimed by defendant; and, in the alternative, asserted title in the defendant based upon the claim of adverse possession of the area in controversy for more than seven years prior to the institution of the action under the applicable Arkansas statute of limitations.

The District Court decided all questions concerning the description and location of the area in controversy in favor of plaintiff, holding that the record title to the land was in the plaintiff but sustaining the defendant's claim of adverse possession. On the first submission of the action we reversed the District Court. This rehearing was granted for a reconsideration of our interpretation and application of controlling Arkansas law on the question of adverse possession.

The facts in the case are stated in the opinion of the District Court, 98 F.Supp. 730, and in our opinion on the first submission of the case, 198 F.2d 812. We are concerned only with the facts pertaining to the question of adverse possession.

The area in controversy is wild, unimproved riparian land, for many years locally known as Cook's Point, on the Arkansas River. Because of the action of the Arkansas River over many years prior to 1926 uncertainty arose as to the correct description and location of the area in controversy. The record discloses that one of plaintiff Kimble's predecessors in title acquired the land on February 10, 1933, under a deed of conveyance which described the area in controversy as located in Desha County, Arkansas. And later,

Bruce T. Bullion, Little Rock, Ark. (Bailey & Warren, Little Rock, Ark., on the brief),. for appellant.

Nicholas J. Gantt, Jr., Pine Bluff, Ark. (Virgil R. Moncrief and John W. Moncrief, Stuttgart, Ark., on the brief), for appellee.

Before JOHNSEN, RIDDICK, and COLLET, Circuit Judges.

RIDDICK, Circuit Judge.

The plaintiff Kimble brought this action against the defendant Willey in the United

on the 31st of July, 1944, because of the uncertainty existing concerning the location of the land, plaintiff's predecessor received a quitclaim deed from the same grantor reciting that a question had arisen as to the county in which the land was located and the intention of the grantor to convey the land whether located in Desha, Arkansas, or Lincoln County, Arkansas. On the 9th of June, 1947, plaintiff Kimble purchased the land from his immediate predecessor under a deed containing the same stipulations as to the county in which the land was located. The correct description and location of the area in controversy was not judicially determined until settled in the present action in the District Court.

In June of 1926 the tax collector of Arkansas County sold the area in controversy, described as located in Arkansas County, for delinquent taxes for the year 1925 to T. P. Bass, Jr., a minor. In June 1928 the land sold by the collector remaining unredeemed, the county clerk of Arkansas County issued to the purchaser a tax deed conveying the lands to him. The deed was duly placed of record in Arkansas County. At some time after the sale of the land for taxes by the authorities of Arkansas County, at a date not fixed by the evidence but prior to October 20, 1930, T. P. Bass entered into possession of the area in controversy on behalf of his minor son, claiming under the tax deed above mentioned, completely enclosed the area by fences and natural barriers, and began to utilize it for grazing cattle.

The District Court found as a fact that the possession of Bass [98 F.Supp. 734] "was actual, open, notorious, hostile, peaceable, adverse, and with the intent to acquire title thereto in opposition to the real owner thereof." And "That the existence of these fences and the grazing of cattle were sufficient to charge Governor Lowden [Kimble's predecessor in title, the owner of adjacent lands during the possession of Bass] with notice that the area in controversy was enclosed and occupied." [1]

T. P. Bass obtained an order from the Probate Court of Arkansas County authorizing him as guardian of his minor son to sell the area in controversy under the description recited in the tax deed to his son. Charles F. Willey, the immediate predecessor in title of defendant Willey, became the purchaser at the sale which was duly approved by the Probate Court. On October 20, 1930, Charles F. Willey received a guardian's deed from Bass. The District Court found that "in executing this deed, it was Bass' intention to sell to Willey and Willey's intention to buy from Bass the area in controversy." [2] On the same day and with the same intention Charles F. Willey leased the area in controversy to Bass for grazing purposes for a term of one year for a consideration of $1 and the agreement of Bass that his continued possession of the area in controversy after the expiration of one year should be the possession of Willey. The lease provided that the lessor should have the benefit of the fences constructed by the lessee, obligated Bass to keep the fences in repair during his occupancy, to keep out trespassers, and prohibited him from subleasing any part of the land or cutting the timber. The guardian's deed from Bass to Charles F. Willey and the lease from Charles F. Willey to Bass were promptly recorded in the records of Arkansas County.

On June 15, 1931, Bass, without yielding possession of the area in controversy to his landlord Willey and without notice to Willey, obtained from Governor Lowden for a term of one year for a consideration of $5 a grazing lease of lands including the area in controversy. This lease was not recorded and Willey had no notice of its

---

1. To constitute adverse possession under Arkansas law it is not necessary that the adverse claimant enclose the land with fences or erect buildings upon it. It is sufficient that his possession is evidenced by the continued use of the land for purposes for which it is susceptible. Davis. v. Strong, 208 Ark. 254, 186 S.W.2d 776.

2. The identical conclusion was made by the Supreme Court of Arkansas in Bass v. Willey, 216 Ark. 553, 226 S.W.2d 980, decided January 30, 1950, holding that Bass as the tenant of Willey was estopped to deny Willey's title.

existence. The lease was never extended or renewed, but it is undisputed that Bass remained in possession, maintaining the fences, and using the area in controversy for grazing cattle until the filing of this action in 1948.

In 1936 Governor Lowden sold timber on certain Arkansas lands including the area in controversy. The contract for the sale of the timber was never recorded. The purchaser began removing timber in July of 1937 and completed operations by August 18, 1937. Charles F. Willey had no notice of the cutting or removal of the timber prior to 1947.

The effect to be given the Bass-Lowden lease, the Bass-Willey lease, and the timber-cutting operations of 1937 under Arkansas law upon Willey's claim of adverse possession of the area in controversy for seven years prior to the institution of this action by Kimble presents the problem in this case.

The District Court made the following declarations of law:

"In determining whether or not a claimant has been in adverse possession of a tract of land for the requisite period of time the possession of his tenant is considered as his own * * *. And a tenant in possession under a landlord claiming under one title may not, without yielding possession, acquire a title hostile to that of his landlord or do anything to adversely affect the landlord's title and possession; nor may he attorn to a title adverse to that of his landlord even though such title is a better title than that of his landlord. * * *"
Concerning the Bass-Lowden lease:

"At the time this lease was executed Bass was upon the land as tenant of Charles F. Willey, and under the laws of Arkansas Lowden was charged with notice of Bass' presence on the land and of the right or title by which he was there. Bass' action in attempting to recognize and hold under the Lowden title without yielding possession to Willey, and without any notoriety, did not prejudice Willey's rights nor did it oust him from possession."

Concerning the timber-cutting operations in 1937:

"Assuming without deciding that this cutting and removing of the timber interrupted Willey's possession of the area, it did not validate Bass' attempted attornment to Governor Lowden, did not change Bass' possession from that of Willey to that of Lowden, did not oust Willey from possession, and did not change the nature of Willey's possession. The continued possession of Bass after August 18, 1937, as the tenant of Willey, which possession possessed all of the attributes necessary to make operative the seven year statute of limitations, persisted for more than seven years and vested title to the area in controversy in Charles F. Willey, and defendant has succeeded to his title and is the owner of the land in controversy."

The question here is whether under controlling Arkansas law Willey's possession of the area in controversy through his tenant Bass was so interrupted by Bass acknowledgment of the title of Lowden as to deprive Willey's possession of the element of hostility necessary to the running of the Arkansas statute of limitations. The opinion of the District Court contains a very full and complete survey of the decisions of the Supreme Court of Arkansas in cases arising between landlord and tenant, vendor and vendee, and dealing with questions of adverse possession. Beyond question, these cases sustain the District Court's ruling that the possession of the tenant is to be considered the possession of his landlord in cases involving the question of adverse possession, and that a tenant is estopped to deny his landlord's title without a surrender of possession under his lease. Admitting that none of the cases mentioned dealt with the precise factual situation involved in the present case, the District Court felt constrained in deciding the question of local substantive law to follow a decision of the Sixth Chancery District of Arkansas in the case of Gwinn v. Reed, in which it was squarely held that a landlord's claim of adverse possession was not affected by

his tenant's recognition of a hostile title. This opinion of the State court is quoted at length in the District Court's opinion.

On reconsideration of the record before us, we reach the conclusion that the decision of the District Court should be affirmed. A Federal court, trial or appellate, on a question of local law is required to accept, in the absence of higher and better evidence to the contrary, the decision of a State intermediate court. West v. American Telephone & Telegraph Co., 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139; Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, Note 7, at page 189, 61 S.Ct. 513, 85 L.Ed. 725.

Nor is the conclusion reached by the District Court without support in other jurisdictions. For example, the general rule is stated in 4 Tiffany Real Property, 2d Ed., § 1168 (citing many cases), as follows:

"If one is in wrongful possession by his tenant, a question may arise as to whether the tenant's acknowledgment of the true owner's title deprives the possession of the element of hostility, so as to interrupt the running of the statute. There are a number of decisions to the effect that such acknowledgment does not interrupt the running of the statute, while it has occasionally been asserted that it does cause such interruption. And in a few cases it has been decided that it causes such interruption if the rightful owner does not know of the relation of tenancy. These latter cases would seem to indicate the proper distinction in this regard. If the rightful owner has no reason to suspect that the person wrongfully in possession of his land is so in possession, not in his own behalf but in behalf of another, he is justified in assuming that the person in possession has full power to characterize his possession as being hostile or the reverse, and if such person acknowledges the true owner's title, the latter is not guilty of laches in failing to take legal proceedings. On the other hand, if the rightful owner has reason to know that the person in possession is in possession merely in behalf of another, he has no right to assume that such person has authority to acknowledge his title, or, by reason of such acknowledgment, to refrain from legal proceedings. In at least one case it has been said that the fact that the landlord is unaware of the acknowledgment by his tenant of the true owner's title is a reason for not regarding such acknowledgment as effecting an interruption. This view is apparently based on the theory that if the landlord is aware of the acknowledgment by the tenant, he may be regarded as having previously authorized it, or as being in a position to repudiate it and to recover possession from the tenant.

"Occasionally the asserted inability of the tenant to interrupt the running of the statute by taking a lease from the true owner is in terms based on the rule that a tenant in possession cannot attorn to a third person not having the reversion. But whether the acknowledgment of title takes the form of an attornment, that is, the acceptance of a lease, is immaterial. The tenant cannot usually interrupt the running of the statute in favor of his landlord, by acknowledging title in the true owner, for the reason that he has no authority to make such an acknowledgment. He represents his landlord for the purpose of holding possession against third persons, but not for the purpose of acknowledging the title of third persons."

■ Under Arkansas law, as the District Court declared, Lowden when he leased to Bass was charged with notice of Bass's possession of the land and the right or title by which he held. Hughes Bros. v. Redus, 90 Ark. 149, 118 S.W. 414; Smith v. Southern Kraft Corporation, 203 Ark. 814, 159 S.W.2d 59; Stricker v. Britt, 203 Ark. 197, 157 S.W.2d 18; Clements v. Fuller, 209 Ark. 849, 192 S.W.2d 762; Lollar v. Appleby, 213 Ark. 424, 210 S.W. 2d 900. Lowden at the time the Bass-Lowden lease was executed had no right to assume that Bass had authority to recognize his title. On the other hand, Lowden was charged with notice of all facts which a reasonable investigation of the basis of Bass's possession would have disclosed. The case of Chicot Lumber Co. v. Dardell, 84 Ark. 140, 104 S.W. 1100, cited in our original opinion, 198 F.2d 812,

817, has no application on the facts in this case. There it was held that the possession of lands for grazing purposes taken and held under contemporaneous grants from opposing claimants to the title was hostile to neither claimant. In this case, however, Bass had been asserting title to the land for several years before the Bass-Lowden lease was executed, and was in actual and hostile possession of the land under claim of ownership at the time he sold to Charles F. Willey and became his tenant under a lease which was placed of record and which required Bass to hold the land for Willey against hostile claimants.

■■ We conclude that the decision of the District Court is supported by available authority. But even in the absence of such authority, this court will not in this case substitute its judgment for that of the District Court.

"This Court has repeatedly ruled that it will accept the considered views of a District Judge as to doubtful questions of local law. Many of the cases in this Court and the Supreme Court which support that rule will be found in the case of Buder v. Becker, 8 Cir., 185 F.2d 311, 315–316. In Western Casualty & Surety Co. v. Coleman, 8 Cir., 186 F.2d 40, 43, we said: 'The burden of demonstrating error is upon the Casualty Company. In a case controlled by local law, that burden is a peculiarly heavy one. This Court is not an appellate court of the State of Missouri and establishes no rules of law for that State. We have repeatedly said that, in reviewing doubtful questions of local law, we would not adopt views contrary to those of the trial judge unless convinced of error, and that all that this Court reasonably can be expected to do in such cases is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the local law. Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Buder v. Becker, 8 Cir., 185 F.2d 311, 315, and cases cited. If a federal district judge has

reached a permissible conclusion upon a question of local law, we will not reverse, even though we may think the law should be otherwise.' " National Bellas Hess, Inc. v. Kalis, 8 Cir., 191 F.2d 739, 741.

The opinion and judgment of this court on the original submission of this case are vacated. The judgment of the District Court is affirmed.

JOHNSEN, Circuit Judge (dissenting).

Our previous opinion noted, 198 F.2d 812, 818, that the general statement has been made in texts and opinions that any attempted attornment by a tenant to a third party, while in occupancy under his lease, is void. As between the landlord and the tenant themselves, or as between the claims of two landlords in relation to each other, both of whom are usurpers,[3] this is the universal rule. But, as our previous opinion pointed out, an examination of the reported cases will show that this general statement does not represent expression which has been made in a consideration and adjudication of the relative legal rights and positions of a legal owner and such an adverse-possession landlord, where the legal owner has protectively entered into a lease with the usurper's tenant without knowledge of the tenancy relationship, and where the legal owner further, in failing to discover the existence of that relationship and the usurper-landlord's claim, cannot be said to have been guilty of any lack of diligence in the making of such inquiry or other investigation as the circumstances of the particular situation reasonably would suggest to a prudent person.

The cases have for the most part involved suits by an adverse-possession landlord against his tenant to recover the rent agreed to be paid or to have the tenant turn back the possession of the property to him, in which the tenant has sought to set up another lease or some extraneous right in escape of his tenancy obligation. Some have been situations in which the tenant has undertaken to acquire a claim

---

3. I use the term "usurper" here in the legal sense of anyone whose possession is wrongful as against the legal owner.

or interest in himself, hostile to that of his landlord, without first having made a surrender. Still others have presented the issue of the superiority of the conflicting rights of the adverse-possession landlord and another usurper, who has undertaken to bolster his cause by having the tenant attorn to him or yield up to him the possession of the property.

A few examples will sufficiently serve, I think, to show the setting and the expression which has been involved in the Arkansas cases. One of the earliest decisions of the Arkansas Supreme Court is Simmons v. Robertson, 27 Ark. 50, which was an action by a landlord against his alleged tenant in unlawful detainer. On the trial, the plaintiff had requested an instruction, which the court refused to give, that "If the jury believe from the evidence that defendant, Robertson, rented the land in dispute from the plaintiff, Simmons, or his agent, he cannot dispute the title of said Simmons to the land." On verdict and judgment for the defendant and appeal by the plaintiff, the Court held that the refusal to give the instruction was error. and made this expression: "It seems to us that there are few, if any, propositions of law better settled than that a tenant cannot dispute his landlord's title, and why the court refused to give the * * * instruction asked by the plaintiff we are unable to see." 27 Ark. at page 53.

Hughes v. Watt, 28 Ark. 153, at page 154, similarly was a suit by a landlord against his tenant to recover possession, and there the Court said: " * * * it is not necessary to inquire into title in a suit merely for possession * * * because it does not lie in the mouth of a tenant who has recognized and contracted with one as owner, and attorned to him while using the premises, to deny a title he has thus confirmed, and retain a possession he has enjoyed by the favor of such landlord."

Burton v. Gorman, 125 Ark. 141, 188 S.W. 561; Casey v. Johnson, 193 Ark. 177,

98 S.W.2d 67, and Bolin v. Drainage District No. 17, 206 Ark. 459, 176 S.W.2d 143, also were suits against tenants by landlords or their privies to recover possession of the leased premises. In the Burton case it was said that a tenant would not be permitted to raise any issue as to his landlord's title without surrendering possession.

Davis v. Grobmyer, 132 Ark. 11, 199 S.W. 917, was a case where a tenant had taken a lease from a railroad company and later entered into another lease with one who claimed to have paid the taxes upon the property for a number of years under the provisions of Kirby's Dig. § 5057, but had never been in actual possession and did not have legal title. The payer of the taxes thereafter sued the occupant, as his alleged tenant, in ejectment, and was held not to be entitled to recover. The court termed him an "intruder" on the railroad's possession and held that the tenant's attornment to him and his subsequent attempt to oust the tenant on the basis thereof could not be made to affect the railroad's rights and turn it out of possession. The opinion does not make clear whether the railroad held title to the property or whether it was itself a usurper. There is some intimation that it too was a usurper. In any event, as the court assumes to discuss, there exists no basis in law for any usurper to throw a previous usurper out of possession, and hence the obtaining by such a usurper of an attornment from the tenant of a previous usurper would be without any substance for legal impact, as a matter of agency, estoppel, or any other principle.

The unreported case of Guinn v. Reed, Miller County Chancery Case No. 8987, decided by an Arkansas trial court,[4] seems to have been particularly relied upon by the District Court and also to be heavily leaned upon by the majority opinion here. The District Court said of the Guinn case, 98 F.Supp. at page 743, that "the Court was confronted with a problem of attorn-

4. I do not pause to consider what convincing manifestation of state law can ordinarily be assumed to be reflected by the undocumented expression, in one individu-

al case, of a single state trial judge, among the many separate judges in a state trial-court system.

ment practically identical with the one now before us", and the majority opinion declares that the case was one "in which it was squarely held that a landlord's claim of adverse possession was not affected by his tenant's recognition of a hostile title."

To me, the case does not come any closer to the question here being considered than does Davis v. Grobmyer, supra, or the other cases which I have discussed. I have not had access to the case, except upon the basis of the facts and quotations set out in the District Court's opinion, 98 F.Supp. at pages 743 and 744, but from this it would appear that the situation was simply one of attornment by a prior usurper's tenant to another usurper. Thus, the District Court's opinion says that the defendant, Reed, had taken possession of the property "with intent to acquire title thereto", and that the plaintiff, Guinn, who was the holder of a void tax title, was attempting to claim that the subsequent attornment to him of Reed's tenant had given him adverse possession of the property and that such holding by him through the tenant had vested him with limitation title. But as I observed in relation to Davis v. Grobmyer, supra, the attempt of a subsequent usurper to deprive a previous usurper of possession is without any substance to give it legal basis.

As to the soundness of all the Arkansas cases which have been referred to, in the legal situations which they have involved, I do not think that there can be any question—although this of course is not a matter of our concern. I am, however, not able to read these cases as rationally implying that the Arkansas Supreme Court has intended, or could be expected to declare as a matter of considered holding, that the relationship of landlord and tenant should be regarded as being legally endowed with absolute sanctity and unqualified supremacy, over all persons, all rights, all statuses, and all principles, that have existence in the entire field of the law, to the extent that may be necessary to afford complete protection to a landlord—

be he legal owner or be he usurper, and be his capacity of landlord notorious or be it undiscoverable—against everything that his tenant may possibly say or do, while the relationship is in existence.

The effect of the holding of the District Court and of the majority here is to declare that to be the Arkansas law. Necessarily, if no attornment by a tenant to a third party can have any possible validity or effect, whether or not the third party has legal rights in the property subject generally to the protection of the law, and whether or not the existence of the landlord-and-tenant relationship is unknown and undiscoverable, then, of course, no act of the tenant which is of lesser legal stature, such as a declaration, an acknowledgment, or other conduct in relation to the property, either in the general community or toward the third party, can be recognized as being legally capable of affecting the landlord's tortious interest.

That would mean, for one thing, that adverse possession once established in favor of a secret landlord, through his tenant's taking of possession under the lease, would not, even though the relationship was unknown and undiscoverable, be affected by the tenant's subsequent declaration to the world at large, or by his acknowledgment to the legal owner, that he was not assuming to hold the property in hostility to the owner's rights and was willing to get off at any time that the owner might desire to have him do so. Under the holding of the District Court and the majority opinion, this would not at all affect the landlord's secret usurpative interest, as a matter of adverse possession law, estoppel, or anything else. Thus, the District Court made the finding and conclusion in the present situation that the possession of the tenant was still "hostile" and "adverse", after his attornment to the legal owner, although the evidence is devoid of any factual element, except the previous lease, as a basis for attributing that reality to the subsequent holding.[5] Contrarily, however, the record

---

5. Neither the District Court nor the majority opinion has purported to find that the landlord-and-tenant relationship or the landlord's claim to the property was a matter of notoriety or of knowledge of any nature in the community at any time.

indicates that actually, from the time the tenant entered into a lease with the legal owner, his attitude of occupancy was one of hostility and of derogation toward the existence of any interest in his previous landlord. To me, the definition made by the Arkansas Supreme Court in numerous cases of the realities necessary to create title by adverse possession do not permit the viewpoint to be harbored that those realities will be given a constructive existence in situations where a tenant-agent goes into possession for another but the landlord's identity and relationship are not made a matter of community notoriety or of suggested existence, naturally prompted inquiry, and ready discoverability.

Again, the absolute legal nullity which it is here held exists as to any attornment made by a tenant to a third party, no matter who the third party is, what his legal interest may be, or under what circumstances the attornment is made—and so also necessarily the lack of ability of any declaration, acknowledgment or conduct whatsoever on the part of the tenant to affect his landlord's interest—must inescapably be given the further significance that no purchaser of property, any more than a legal owner, can be protected by any inquiry which he makes of the tenant as the party in possession or by any lease which he makes with the tenant, regardless of the fact that the tenant conceals the fact of his existing tenancy relationship and that there is nothing in the situation which reasonably suggests the existence of the usurper-landlord and his relationship to the property. That is utterly unreconcilable with the broad doctrine of notice, inquiry and estoppel laid down by the Arkansas Supreme Court, to which the District Court and the majority opinion apparently have given no consideration. The Arkansas cases have said generally many times that, where actual knowledge does not exist in a legal situation, the law makes the question one of notice; that notice is equivalent to knowledge as to all facts in such a situation that a diligent inquiry would disclose; and that notice itself is to be regarded as consisting of such elements in the situation involved as would reasonably put a man of ordinary intelligence on inquiry. See e. g. Trinity Royalty Co. v. Riggins, 199 Ark. 939, 136 S.W.2d 473; Dean v. Freeze, 213 Ark. 264, 209 S.W.2d 876; Kellogg-Fontaine Lumber Co. v. Cronic, 219 Ark. 170, 240 S.W.2d 872. The Arkansas Supreme Court has never said that situations of landlord-and-tenant relationship are wholly outside the operation of this fundamental catch-all doctrine, and, as a matter of common sense and plain justice, I can see no basis for believing that the Court would artificially refuse to apply it to the existing legal rights of an owner or purchaser of property as against adverse-possession claimants of landlord-and-tenant relationships, both secret and open.

All of these considerations, as well as the fact that the view here expressed has also been the result reached by those courts which have specifically dealt with the question involved, some of which cases are set out in our previous opinion, 198 F.2d at pages 819–821, leave me with the firm conviction that the Arkansas law is not the literal absolutism declared by the District Court and the majority opinion, but that it is and can only be regarded as being, as held in our previous opinion, that the principle that a tenant may not dispute his landlord's title does not operate to prevent the continuity of the hostile possession of an adverse-claimant landlord from being broken by an attornment of his tenant to the legal owner (or a purchaser of the property) where the situation is one in which the latter is without any knowledge, or other notice than the fact of occupancy itself, of the relationship between the tenant and the adverse claimant, and where he cannot be said to be guilty of failing to make such inquiry as ordinary diligence in the circumstances of the particular situation would reasonably suggest.

We did not in our previous opinion, nor do I attempt to here, consider what in-

And the recording of the lease, as referred to in the opinion of the majority, was not made in the county where the land was located but in another county, so that it never gave any constructive notice to anyone.

quiry, if any, may have been called for, on the part of plaintiff's predecessor or of plaintiff himself as a subsequent purchaser, by the circumstances of the situation, or whether such inquiry, if any, as might be called for was made. Under the holding of the District Court and of the majority here, that question would be immaterial, and the evidence does not appear to have been developed in relation to it on the trial. It would of course have been a proper matter for development and consideration under the remand of our previous opinion.

As to the other question covered by our previous opinion—whether, if the landlord's holding was broken by the timber-cutting operations of 1937, as the trial court assumed without deciding, the possession taken by the tenant thereafter had to be regarded as a permissive and not a hostile entry for purposes of adverse possession law, in view of his having the two leases, with one just as much in force as the other—I shall not here repeat the discussion of the previous opinion but merely incorporate it by reference, 198 F.2d 812, as a part of this dissent.

Perhaps this case may serve to bring the immediate question which has been dealt with into the test tube of some of our Law Review laboratories.